# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **STEWART TITLE GUARANTY COMPANY** : | |
| 1360 Post Oak Road, Suite 100 : | CIVIL ACTION |
| Houston, TX 77056 : | |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| **LAW OFFICES of DAVID FLEISCHMANN, P.C.** : | |
| 2233 Nostrand Avenue, Third Floor : | |
| Brooklyn, NY 11210-3045 : | |
| and : | |
| **DAVID FLEISCHMANN, Esquire** : | |
| 2233 Nostrand Avenue, Third Floor : | |
| Brooklyn, NY 11210-3045 : | |
| and : No.   3:21-CV-16713 |
| **ANDREW SELEVAN, Esquire** : | |
| 83 South Street, Suite 302 : | |
| Freehold, NJ 07728-2492 : | |
| and : | |
| **WORLD WIDE LAND TRANSFER, LLC** : | |
| f/k/a **WORLD WIDE LAND TRANSFER, Inc.** : | |
| 50 Harrison Street, Suite PH 446 : | |
| Hoboken, NJ 07030 : | |
| Defendants : | |

## AMENDED
## COMPLAINT

Plaintiff Stewart Title Guaranty Company, by and though undersigned counsel, hereby files

this Complaint against the above-named Defendants, and avers as follows:

## PARTIES

1.     Plaintiff Stewart Title Guaranty Company (**"STGC"**) is a Texas corporation with

its principal place of business located as stated above.

2.     STGC is a title insurance underwriter authorized to conduct business in New Jersey

and throughout the United States.

3.     Defendant Law Offices of David Fleischmann, P.C. (the **"Law Firm"**) is a New York professional corporation, with its principal place of business located as stated above.

4.     Defendant David Fleischmann, Esquire (**"Fleischmann"**), is a member of the New York and New Jersey bars.

5.     On information and belief, Fleischmann is a principal of the Law Firm.

6.     Defendant Andrew Selevan, Esquire (**"Selevan"**) is a member of the New York and New Jersey bars.

7.     Defendant World Wide Land Transfer, LLC, formerly known as World Wide Land Transfer, Inc. (**"World Wide"**) is a Pennsylvania limited liability company.

## JURISDICTION AND VENUE

8.     The Plaintiff is a citizen of the State of Texas for the reasons set forth above.

9.     On information and belief, Fleischmann resides in, and is a citizen of, the State of New York.

10.     The Law Firm is a citizen of the State of New York for the reasons set forth above.

11.     On information and belief, Selevan resides in, and is a citizen of, the State of New Jersey.

12.     On information and belief, no member of World Wide is a citizen of the State of Texas.

13.     Complete diversity of citizenship thus exists between the Plaintiff and each of the Defendants, within the meaning of 28 U.S.C. §1332(a)(1).

14.     The matter in controversy exceeds the sum of $75,000.00, excluding interest and costs, within the meaning of 28 U.S.C. §1332(a), as hereinafter set forth in detail.

15.     Venue is proper in this Court according to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims hereinafter set forth occurred within New Jersey.

## FACTUAL BACKGROUND

16.     Over a million dollars is missing from two simultaneous mortgage closings which occurred on September 7, 2018.  Only the Law Firm and Fleischmann know where the money went.

17.     Over a million dollars was delivered by World Wide, the closing settlement agent, to the Law Firm for the purpose of satisfying existing mortgages on the properties being refinanced.

18.     The Law Firm received the money but did not transmit the funds to satisfy the existing mortgages.

19.     Fleischmann denies that his firm still holds the transferred funds in his trust account, but will not say to whom they were transmitted, or on what authority.

20.     Only Attorney Fleischmann (or others employed by the Law Firm) can tell us what happened to the missing money.

## THE  REFINANCE TRANSACTIONS

21.     Seth Levine is an adult individual who – relevant to this matter – controlled more than 70 limited liability companies, each of which owned one or more apartment buildings, most located within the State of New Jersey.

22. The facts set forth in the previous paragraph were taken from a criminal "information" filed in this court at number 21-CR-234(sjw) on March 18, 2021, in a case entitled "USA v. Sean Levine". Mr. Levine has agreed to plead guilty to two of the charges contained in the information, and sentencing is now scheduled for October 5, 2021. Because neither Mr. Levine nor the entities described in the next paragraph are parties hereto, these facts are included only to give context to the remainder of the Complaint.

23. In the summer of 2018, Amboy LP Ventures, LLC (**"Amboy"**) and North Bergen Ventures, LLC (**"North Bergen"**) sought to refinance mortgages on the real properties that they owned, located at 285 Bertrand Avenue, Perth Amboy, NJ, and 1147 7th Avenue, North Bergen, NJ, respectively (each a **"Property"**) and collectively, the **"Premises"**).

24. Nexus Capital Investment, LLC (**"Nexus"**) agreed to extend mortgage loans to Amboy and to North Bergen (the **"Borrowers"**), in the amounts of $472,500.00 and $675,000.00, respectively (the **"Nexus Loans"**).

25. Copies of the Commitment Letters issued by Nexus are attached as **Exhibit "A"** and **"B"**.

26. The Nexus Loan transactions closed (the **"Closings"**) on September 9, 2018.

27. Copies of the recorded Nexus mortgages are attached as **Exhibits "C"** and **"D"**, respectively.

28. At closing, World Wide issued title insurance policies for the two mortgages evidencing the Nexus Loans (the **"Title Policies"**) underwritten by STGC, insuring each as a first lien secured by the respective Premises.

29. The Nexus Loans were immediately assigned to non-party PS Funding, Inc. (**"PS Funding"**).

30.     Copies of the recorded Assignments from Nexus to PS Funding are attached as **Exhibits "E"** and **"F"**.

31.     Upon the assignment of the Nexus loans to PS Funding, PS Funding became an "insured" under each of the Title Policies.

32.     Defendant World Wide acted as both settlement agent and policy issuing agent for both of the Closings.

33.     Defendant Selevan attended the Closings as counsel for the Borrowers.

## THE PRIOR MORTGAGES

34.     At the time of the Closings, each of the properties comprising the Premises was encumbered by an existing mortgage (the "Prior Mortgages") in favor of PrivCap Funding, LLC (**"PrivCap"**).

35.     At the Closings, Selevan provided World Wide with payoff instructions (the **"Selevan Payoff Instructions"**), so that the Prior Mortgages could be paid off and released from the Premises as part of the Closings.

36.     Copies of the Selevan Payoff Instructions are attached as **Exhibits "G"** and **"H"**, respectively.

37.     The Selevan Payoff Instructions directed that the payoff amounts due to PrivCap be sent to the Law Firm.

38.     After the Closings, it was discovered that the Prior Mortgages had not been paid off and the Prior Mortgages remained as liens against the Premises.

## THE FORECLOSURES of the PRIOR MORTGAGES
## and THE PURCHASE of THOSE LOANS BY STGC

39.     On May 13, 2020, PrivCap commenced actions to foreclose the Prior Mortgages.

40.     The Amboy foreclosure was assigned docket number F-6096-20; the North Bergen foreclosure was assigned docket number F-6098-20.

41.     PS Funding was made a party to each of the PrivCap foreclosures because it held a mortgage on each Property as a result of the Closings.

42.     At or about the same time that PrivCap filed the foreclosure complaints – long after the Closings had been completed, and the funds sent to the Law Firm – World Wide learned that PrivCap had never received the payoff funds for either of its loans, and that the Prior Mortgages thus remained unsatisfied with lien priorities senior to those of the mortgages securing the Nexus loans.

43.     Demand was made upon the Law Firm for return of the payoff funds, but they were not returned.

44.     Shortly after learning that the Prior Mortgages had not been paid off, PS Funding made claims under the Title Policies to STGC, and STGC retained counsel to defend the priority of the insured mortgages held by PS Funding.

45.     Shortly after PrivCap filed its foreclosure complaints, PrivCap's counsel issued a subpoena (in the Amboy foreclosure) to the Law Firm, seeking information about the disposition of the payoff funds.

46.     Nexus objected vociferously to the subpoena and filed a Motion to Quash it.

47.     A copy of the Motion to Quash is attached as **Exhibit "I"**.

48.     PS Funding's response to the Motion to Quash is attached as **Exhibit "J"**.

49. Included as part of the response to the Motion to Quash is a Certification taken by Juan Polistico, Closing Coordinator for World Wide, dated July 15, 2020, which accurately recounts the sequence of events leading up to the commencement of the PrivCap foreclosures.

50. The Motion to Quash was withdrawn before a decision was rendered on it.

51. Because the mortgages securing the Nexus Loans were not liens against the respective Premises (for the reasons set forth above) STGC, pursuant to the terms of its Title Policies, tendered policy limits to PS Funding and took assignment of PS Funding's interests. This occurred in the fall of 2020.

52. As a direct and proximate result of Defendants' acts and omissions, STGC has suffered, and continues to suffer, substantial losses and damages as identified herein and as yet to be determined.

## COUNT I

### NEGLIGENCE against LAW FIRM, FLEISCHMANN and SELEVAN

53. The Plaintiff hereby incorporates the above paragraphs as though fully set forth again at length.

54. At all relevant times, Fleischmann was an agent of the Law Firm, acting within the course and scope of his employment or other relationship with the Law Firm.

55. Of the $1,006,950.00 in payoff funds described above, $455,750.00 was intended to pay off the prior mortgage on the Amboy property, and $551,200.00 was intended to pay off the prior mortgage on the North Bergen property.

56.     Fleischmann and the Law Firm (including employees thereof whose identities are not presently known to the Plaintiff) were negligent in failing to remit the payoff funds to PrivCap to pay off the Prior Mortgages.

57.     Selevan acted negligently by failing to confirm that the Selevan Payoff Instructions were genuine before furnishing them to World Wide.

58.     As a result of the negligence described above, STGC paid $1,006,950.00 to resolve the title claims that PS Funding had made under the Title Policies (the **"Loss"**).

**WHEREFORE**, Plaintiff Stewart Title Guaranty Company demands judgment against Defendants Law Offices of David Fleischmann, P.C., David Fleischmann, Esquire, and Andrew Selevan, Esquire, jointly and severally, in an amount not less than $1,006,950.00, together with interest, other compensatory damages, consequential damages, attorney's fees and costs, and such further relief as this Court deems just and proper.

## COUNT II

## BREACH of CONTRACT AGAINST WORLD WIDE

59.     The Plaintiff hereby incorporates by reference the above paragraphs as though fully set forth again at length.

60.     On or about April 1, 2005, STGC and World Wide entered into a Title Insurance Underwriting Agreement (Non-Exclusive Form), a copy of which is attached as **Exhibit "K"** (the **"Agency Agreement"**).

61.     Pursuant to, and subject to the terms of, the Agency Agreement, STGC appointed World Wide as its non-exclusive limited agent for the purpose of issuing insured closing letters,

title insurance commitments and title insurance policies in the name of STGC in New Jersey and other designated states.

62.     Paragraph 3(a) of the Agency Agreement provides that World Wide "shall conduct its business in a sound and ethical manner and shall issue title policies according to recognized underwriting practices, the rules and instructions given by [STGC], and those rules and instructions imposed by the Department of Insurance or other regulatory body".

63.     Paragraph 3(b) of the Agency Agreement requires that each title policy issued by World Wide "shall correctly reflect the status of title as of the date and time of said policy with appropriate exceptions as to liens, defects, encumbrances, and or objections disclosed by the search and examination of title or known by [World Wide] to exist."

64.     Paragraph 4(e) of the Agency Agreement provides that World Wide "shall not without [STGC's] prior written consent insure over a title defect, lien, or encumbrance, regardless of any indemnity or deposit that World Wide shall obtain".

65.     Paragraph 5 of the Agency Agreement pertains to the division of loss and loss expense, and provides in pertinent part that:

> "The term 'Loss' shall include the amount paid to or for the benefit of the insured as well as loss adjustment expense including any cost of defending the claim resulting in the loss.
>
> *                         *                         *
>
> (b)     On each such loss due to fraud or intentional act or omission of [World Wide] or its employees, representatives, or agents, or due to the negligence thereof; [World Wide] shall be liable to [STGC] for the entire amount of such loss including, but not limited to, attorneys' fees, litigation expenses, and costs of settlement negotiations.  Such losses include but are not limited to:
>
> (1)     Failure of title plant to disclose matters causing loss.

(2)     Failure to discover or report any instrument of record affecting title.

(3)     Violations of escrow instructions.

(4)     Failure to follow underwriting guidelines and/or instructions of [STGC].

(5)     Failure to prepare a title policy which shows defects and matters affecting title disclosed in the title search or which should have been disclosed in the title search.

66.     Pursuant to paragraph 5 of the Agency Agreement, World Wide is obligated to indemnify and reimburse STGC for the Loss.

67.     World Wide has breached the Agency Agreement by, among other things, (a) failing to ensure that the Prior Mortgages were paid off and released of record as required by the title insurance commitment; and (b) failing upon demand to repay to STGC the amount of the Loss described above.

68.     As a result of World Wide's breach of the Agency Agreement, World Wide is indebted to STGC in the amount of $1,006.950.00, plus interest, and the attorneys' fees and costs incurred by STGC in this action.

**WHEREFORE**, Plaintiff, Stewart Title Guaranty Company, respectfully requests the Court to enter judgment in its favor and against Defendant, World Wide Land Transfer, LLC f/k/a World Wide Land Transfer, Inc., in the amount of $1,006,950.00, plus interest, attorneys' fees and costs.

## COUNT III

## NEGLIGENCE (in the alternative) AGAINST WORLD WIDE

69.     The Plaintiff hereby incorporates by reference the above paragraphs as though fully

set forth again at length.

70.    World Wide acted negligently, and failed to exercise due care, when it transmitted the proceeds of the refinance transactions that were due PrivCap to the Law Firm's trust account.

71.    World Wide acted negligently, and failed to exercise due care by, among other things, failing to ensure that PrivCap actually received the funds for the payoff and release of the Prior Mortgages and that PrivCap had authorized the payoff instructions which directed payment to be sent to the Law Firm.

72.    As a result of World Wide's negligence, STGC suffered damages in the amount of $1,006.950.00.

**WHEREFORE**, Plaintiff, Stewart Title Guaranty Company, respectfully requests the Court to enter judgment in its favor and against Defendant, World Wide Land Transfer, LLC f/k/a World Wide Land Transfer, Inc., in the amount of $1,006,950.00, plus interest and costs.


## COUNT IV

## <u>CONVERSION (in the alternative) AGAINST LAW FIRM and FLEISCHMANN</u>

73.    The Plaintiff hereby incorporates the above paragraphs as though fully set forth again at length.

74.    Upon information and belief, the Law Firm is no longer in possession of all or a portion of the payoff funds.

75.    Upon information and belief, the Law Firm transferred all or a portion of the payoff funds to others shortly after receiving those funds.

76.    The actions of the Law Firm and Fleischmann constituted a conversion of the payoff funds.

**WHEREFORE**, Plaintiff, Stewart Title Guaranty Company, respectfully requests the Court to enter judgment in its favor and against Defendants Law Offices of David Fleischmann, P.C., and David Fleischmann, Esquire, jointly and severally, in an amount not less than $1,006,950.00, plus interest, attorneys' fees and costs.

## COUNT V

### FRAUD (in the alternative) AGAINST LAW FIRM, FLEISCHMANN and SELEVAN

77.     The Plaintiff hereby incorporates by reference the above paragraphs as though fully set forth again at length.

78.     Selevan published the Selevan Payoff Instructions to World Wide, PS Funding and others.

79.     The Selevan Payoff Instructions were false, in that they directed that the funds due PrivCap were to be sent to the Law Firm rather than to PrivCap. as PrivCap's true instructions had directed.

80.     Selevan knew or should have known when he published the Selevan Payoff Instructions that they were false.

81.     Selevan intended that others, including but not limited to, the Plaintiff, World Wide and Nexus, would rely on the false Selevan Payoff Instructions.

82.     World Wide, Nexus, STGC and others in fact relied upon the Selevan Payoff Instructions in proceeding with the Closing.

83.     Upon information and belief, Fleischmann and the Law Firm knew that the Selevan Payoff Instructions were false but took no action to prevent their use.

84.     As a result of the foregoing, the Plaintiff was damaged as hereinabove described.

**WHEREFORE**, Plaintiff, Stewart Title Guaranty Company, respectfully requests the Court to enter judgment in its favor and against Defendants Law Offices of David Fleischmann, P.C., David Fleischmann, Esquire, and Andrew Selevan, Esquire, jointly and severally, in an amount not less than $1,006,950.00, plus interest, attorneys' fees and costs.

Respectfully submitted,

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

By:     */S/ William J. Levant, Esquire*
William J. Levant, Esquire (020151988)
(610)941-2474
(610)684-2020 – Telecopier
wlevant@kaplaw.com

and

Michael P. Coughlin, Esquire (004911989)
(610)941-2456
(610)684-2009 – Telecopier
mcoughlin@kaplaw.com
1800 Chapel Avenue West, Suite 320
Cherry Hill, NJ 08002
Attorneys for Plaintiff

Date: September 8, 2021

## DESIGNATION OF TRIAL COUNSEL

William J. Levant and Michael P. Coughlin, Esquires, are designated as trial counsel in the above captioned action pursuant to Rule 4:25-4.

**KAPLIN STEWART MELOFF REITER & STEIN P.C.**
Attorneys for Plaintiff

By:     */S/ William J. Levant, Esquire*
        William J. Levant, Esquire
        Michael P. Coughlin, Esquire

Date: September 8, 2021

## CERTIFICATION PURSUANT TO R. 4:5-1

Pursuant to R. 4:5-1, I hereby certify that the matter in controversy is not the subject of any other action pending in any Court, and no other action or arbitration proceeding is contemplated. Further, to the best of my knowledge and belief, there is no other party who should be joined in this action at this time, though there are other potential defendants who may be joined pending the outcome of initial discovery.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**KAPLIN STEWART MELOFF REITER & STEIN P.C.**
Attorneys for Plaintiff

By:     */S/ William J. Levant, Esquire*
        William J. Levant, Esquire
        Michael P. Coughlin, Esquire

Date : September 8, 2021

14

## CERTIFICATION PURSUANT TO R. 1:38-7(c)(2)

Pursuant to R. 1:38-7(c)(2), I hereby certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from subsequent papers submitted to the Court.

**KAPLIN STEWART MELOFF REITER & STEIN P.C.**
Attorneys for Plaintiff

By: */S/ William J. Levant, Esquire*
William J. Levant, Esquire
Michael P. Coughlin, Esquire

Date: September 8, 2021

EXHIBIT "A"



NEXUS
CAPITAL
INVESTMENTS

August 23, 2018

Seth Levine
210 River Ave
Hackensack , NJ 07601

Dear Mr. Levine,

Nexus Capital Investments (Nexus) is pleased to present to you the following loan proposal, to be
collateralized by the below referenced property.

| | |
|---|---|
| **Borrower:** | ENTITY TBD |
| **Total Loan Amount:** | $472,500 |
| **LTV:** | Not to exceed 75% of As-Is Value |
| **Purpose:** | The loan proceeds shall be used for the refinance of the subject property |
| **Collateral:** | 285 Bertland Ave Perth Amboy NJ 08859 |
| **Guarantor:** | Seth Levine and any member owning 11% or more of the entity |
| **Term:** | 12 month term |
| **Ext:** | N/A |
| **Pre-payment:** | 3 Months interest earned. Afterwarda, the loan is pre-payable in whole or in part at any time with no penalty. |
| **Amortization:** | N/A |
| **Interest Rate:** | The loan shall bear a fixed interest rate of Eleven Percent (11%) per annum to be paid on a monthly basis. |
| **Origination Fee:** | 2% |

"Today's solutions. Tomorrow's success."

718.360.4100 • 2233 Nostrand Avenue, 3rd Floor, Brooklyn, NY 11210 • NexusCi.com



**NEXUS CAPITAL INVESTMENTS**

| | |
|---|---|
| **Payment:** | Monthly Payments of Interest Only |
| **Transferability:** | The Loan shall be due and payable in full upon any transfer or sale of the Property or any change, transfer or sale of ownership interest in the Borrower. |
| **Survey:** | N/A |
| **Appraisal:** | Borrower to pay the cost of a market value appraisal of the premises prepared by an appraiser approved by Nexus Capital |
| **Title:** | Title Co. TBD |
| **Environmental:** | TBD |
| **Closing Costs:** | Customary closing costs, including but not limited to basic title, legal fees (TBD), processing and filing fees (TBD) and any other expense associated with the loan are all to be paid by the borrower. |
| **Participants:** | The Lender reserves the right to participate, sell or assign its interest in the Loan and the Borrower agrees to execute any documentation necessary to facilitate this. |
| **Good Faith Deposit:** | Waived on this deal |

**Due Diligence Required (Further documentation may be required upon Underwriting and Title review):**

- A current, signed personal financial statement and REO
- An executed copy of the PSA
- Copy of Borrowers Drivers License
- Name and Contact for appaisal access
- Leases – if the property is occupied
- Insurance
- Borrower Credit Report
- All Entity Docs and OA
- Certificate of Good Standing for Entity

Both Borrower and Lender agree to use their commercially reasonable efforts to consummate the loan as contemplated in this term sheet. However, this term sheet does not represent a loan approval, and all aspects of any loan remain subject to Lender's underwriting and approval.

If you agree to the proposed terms and would like us to further consider this application and initiate formal processing of your request, please sign and return this letter along with the good faith deposit. If these materials are not received within five (5) business days, the conditions described in this letter will be considered null and void.

Please telephone Aaron Zlotowitz at 347.587.9261 if you have any questions or would like to discuss the proposed terms.

Very truly yours,

Nexus Capital Investments

Agreed and accepted:

Seth Levine

EXHIBIT "B"



NEXUS
CAPITAL
INVESTMENTS

August 23, 2018

Seth Levine
210 River Ave
Hackensack , NJ 07601

Dear Mr. Levine,

Nexus Capital Investments (Nexus) is pleased to present to you the following loan proposal, to be collateralized by the below referenced property.

| | |
|---|---|
| **Borrower:** | ENTITY TBD |
| **Total Loan Amount:** | $675,000 |
| **LTV:** | Not to exceed 75% of As-Is Value |
| **Purpose:** | The loan proceeds shall be used for the refinance of the subject property |
| **Collateral:** | 1114 7th Street North Bergen NJ 07047 |
| **Guarantor:** | Seth Levine and any member owning 11% or more of the entity |
| **Term:** | 12 month term |
| **Ext:** | N/A |
| **Pre-payment:** | 3 Months interest earned. Afterwarda, the loan is pre-payable in whole or in part at any time with no penalty. |
| **Amortization:** | N/A |
| **Interest Rate:** | The loan shall bear a fixed interest rate of Eleven Percent (11%) per annum to be paid on a monthly basis. |
| **Origination Fee:** | 2% |



| | |
|---|---|
| **Payment:** | Monthly Payments of Interest Only |
| **Transferability:** | The Loan shall be due and payable in full upon any transfer or sale of the Property or any change, transfer or sale of ownership interest in the Borrower. |
| **Survey:** | N/A |
| **Appraisal:** | Borrower to pay the cost of a market value appraisal of the premises prepared by an appraiser approved by Nexus Capital |
| **Title:** | Title Co. TBD |
| **Environmental:** | TBD |
| **Closing Costs:** | Customary closing costs, including but not limited to basic title, legal fees (TBD), processing and filing fees (TBD) and any other expense associated with the loan are all to be paid by the borrower. |
| **Participants:** | The Lender reserves the right to participate, sell or assign its interest in the Loan and the Borrower agrees to execute any documentation necessary to facilitate this. |
| **Good Faith Deposit:** | Waived on this deal |

**Due Diligence Required (Further documentation may be required upon Underwriting and Title review):**

- A current, signed personal financial statement and REO
- An executed copy of the PSA
- Copy of Borrowers Drivers License
- Name and Contact for appaisal access
- Leases – if the property is occupied
- Insurance
- Borrower Credit Report
- All Entity Docs and OA
- Certificate of Good Standing for Entity

Both Borrower and Lender agree to use their commercially reasonable efforts to consummate the loan as contemplated in this term sheet. However, this term sheet does not represent a loan approval, and all aspects of any loan remain subject to Lender's underwriting and approval.

If you agree to the proposed terms and would like us to further consider this application and initiate formal processing of your request, please sign and return this letter along with the good faith deposit. If these materials are not received within five (5) business days, the conditions described in this letter will be considered null and void.

Please telephone Aaron Zlotowitz at 347.587.9261 if you have any questions or would like to discuss the proposed terms.

Very truly yours,

Nexus Capital Investments

Agreed and accepted:

Seth Levine

EXHIBIT "C"



## Middlesex County
## Document Summary Sheet

MIDDLESEX COUNTY CLERK

PO BOX 871

JOHN F. KENNEDY SQUARE

NEW BRUNSWICK NJ 08901

INSTR # 2018079967
O BK 17293 PG 575
RECORDED 09/12/2018 12:41:50 PM
ELAINE M. FLYNN, COUNTY CLERK
MIDDLESEX COUNTY, NEW JERSEY
RECORDING FEES $325.00

**Official Use Only**

| Transaction Identification Number | | 3570760 | 3043556 |
|---|---|---|---|
| **Submission Date** *(mm/dd/yyyy)* | 09/10/2018 | **Return Address** *(for recorded documents)* | |
| **No. of Pages** *(excluding Summary Sheet)* | 30 | WORLD WIDE LAND TRANSFER | |
| **Recording Fee** *(excluding transfer tax)* *(Convenience Charge of $2.00 included)* | $325.00 | BUILDING 8 NESHAMINY INTERPLEX SUITE 112 | |
| **Realty Transfer Tax** | $0.00 | TREVOSE, PA 19053 | |
| **Total Amount** | $325.00 | | |
| **Document Type** | MORTGAGE | | |

**Municipal Codes**

| PERTH AMBOY | | PA |
|---|---|---|

| **Batch Type** | L2 - LEVEL 2 (WITH IMAGES) |
|---|---|

### Bar Code(s)

258250

### Additional Information (Official Use Only)

*** DO NOT REMOVE THIS PAGE.**
*COVER SHEET [DOCUMENT SUMMARY FORM] IS PART OF MIDDLESEX COUNTY FILING RECORD.*
*RETAIN THIS PAGE FOR FUTURE REFERENCE.*



**Middlesex County**
**Document Summary Sheet**

| | | |
|---|---|---|
| **Type** | MORTGAGE | |
| **Consideration** | $472,500.00 | |
| **Submitted By** | SIMPLIFILE, LLC. (SIMPLIFILE) | |
| **Document Date** | 09/07/2018 | |
| **Reference Info** | | |

**MORTGAGE**

| Book ID | Book | Beginning Page | Instrument No. | Recorded/File Date |
|---|---|---|---|---|
| | | | | |

| MORTGAGOR | Name | Address |
|---|---|---|
| | AMBOY LP VENTURES LLC | |

| MORTGAGEE | Name | Address |
|---|---|---|
| | NEXUS CAPITAL INVESTMENTS LLC | |

**Parcel Info**

| Property Type | Tax Dist. | Block | Lot | Qualifier | Municipality |
|---|---|---|---|---|---|
| | | | | | |

*** DO NOT REMOVE THIS PAGE.**
*COVER SHEET [DOCUMENT SUMMARY FORM] IS PART OF MIDDLESEX COUNTY FILING RECORD.*
*RETAIN THIS PAGE FOR FUTURE REFERENCE.*

**RECORDING REQUESTED BY**
**AND WHEN RECORDED MAIL TO:**

Koss & Schonfeld, LLP
90 John Street, Suite 503
New York, New York 10038
Attn: Simcha D. Schonfeld, Esq.

Loan No.: 508

*THIS SPACE FOR RECORDER'S USE ONLY*

**ATTENTION: COUNTY CLERK  THIS SECURITY INSTRUMENT IS A SECURITY AGREEMENT AND FINANCING STATEMENT UNDER THE NEW JERSEY UNIFORM COMMERCIAL CODE. PORTIONS OF THE PROPERTY ARE GOODS WHICH ARE OR ARE TO BECOME AFFIXED TO OR FIXTURES ON THE LAND. THIS SECURITY INSTRUMENT IS, THEREFORE, TO BE FILED FOR RECORD OR RECORDED AS A FIXTURE FILING IN, AMONG OTHER PLACES, THE REAL ESTATE RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED.  THE MORTGAGOR/BORROWER IS THE OWNER OF A RECORD INTEREST IN THE REAL ESTATE CONCERNED.  THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS.**

*[DRAFTING NOTE: THIS MORTGAGE IS ONLY FOR USE FOR MULTIFAMILY PROPERTIES CONTAINING SIX (6) OR MORE RESIDENTIAL UNITS]*

**MORTGAGE, SECURITY AGREEMENT,**
**ASSIGNMENT OF LEASES AND RENTS**
**AND FIXTURE FILING**

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this "Security Instrument"), is made this 7th day of September, 2018 by AMBOY LP VENTURES LLC, a New Jersey limited liability company, the address of which is 210 River Street, Suite 24, Hackensack, New Jersey, 07601, as Borrower ("Borrower"), to Nexus Capital Investments, LLC, a New York limited liability company, the address of which is 2233 Nostrand Ave, 3rd Floor, Brooklyn, New York 11210, together with its successors and/or assign, as Lender ("Lender").

  **1.**  **Granting Clause.**  Borrower, in consideration of the acceptance by Lender, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the obligations described in Section 3 below, irrevocably grants, bargains, sells, assigns and conveys to Lender and its successors and assigns, forever, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, all of Borrower's estate, right, title, interest, claim and demand in and to the property in the County of Middlesex, State of New Jersey, with a street address of 285 Bertrand Avenue, Perth Amboy, New Jersey 08861 (which address is provided for reference only and shall in no way limit the description of the real and personal property otherwise described in this Section 1), described as follows, whether now existing or hereafter acquired (all of the property described in all parts of this Section 1 and all additional property, if any, described in Section 2 is called the "Property"):

  **1.1**  **Land and Appurtenances.**  The land described on Exhibit A hereto, and all tenements, hereditaments, rights-of-way, easements, appendages and appurtenances thereto belonging or in any way appertaining, including without limitation all of the right, title and interest of Borrower in and to any avenues, streets, ways, alleys, vaults, strips or gores of land adjoining that property, all rights to water, water stock, drains, drainage and air rights relating to that property, and all claims or demands of Borrower either in law or in equity in possession or expectancy of, in and to that property; and

1117492/LA

1.2 **Improvements and Fixtures**. All buildings, structures and other improvements now or hereafter erected on the land described in <u>Section 1.1</u> above, and all facilities, fixtures, machinery, apparatus, installations, goods, equipment, inventory, furniture, building materials and supplies and other properties of whatsoever nature, now or hereafter located in or used or procured for use in connection with that property, it being the intention of the parties that all property of the character described above that is now owned or hereafter acquired by Borrower and that is affixed or attached to, stored upon or used in connection with the land described in <u>Section 1.1</u> above shall be, remain or become a portion of that property and shall be covered by and subject to the lien of this Security Instrument, together with all contracts, agreements, permits, plans, specifications, drawings, surveys, engineering reports and other work products relating to the construction of the existing or any future improvements on the Property, any and all rights of Borrower in, to or under any architect's contracts or construction contracts relating to the construction of the existing or any future improvements on the Property, and any performance and/or payment bonds issued in connection therewith, together with all trademarks, trade names, copyrights, computer software and other intellectual property used by Borrower in connection with the Property; and

1.3 **Enforcement and Collection**. Any and all rights of Borrower without limitation to make claim for, collect, receive and receipt for any and all rents, income, revenues, issues, earnest money, deposits, refunds (including but not limited to refunds from taxing authorities, utilities and insurers), royalties, and profits, including mineral, oil and gas rights and profits, insurance proceeds of any kind (whether or not Lender requires such insurance and whether or not Lender is named as an additional insured or loss payee of such insurance), condemnation awards and other moneys, payable or receivable from or on account of any of the Property, including interest thereon, or to enforce all other provisions of any other agreement (including those described in <u>Section 1.2</u> above) affecting or relating to any of the Property, to bring any suit in equity, action at law or other proceeding for the collection of such moneys or for the specific or other enforcement of any such agreement, award or judgment, in the name of Borrower or otherwise, and to do any and all things that Borrower is or may be or become entitled to do with respect thereto, provided, however, that no obligation of Borrower under the provisions of any such agreements, awards or judgments shall be impaired or diminished by virtue hereof, nor shall any such obligation be imposed upon Lender; and

1.4 **Accounts and Income**. Any and all rights of Borrower in any and all accounts, rights to payment, contract rights, chattel paper, documents, instruments, licenses, contracts, agreements and general intangibles relating to any of the Property, including, without limitation, rent from any leases and any other income and profits derived from the operation of any business on the Property or attributable to services that occur or are provided on the Property or generated from the use and operation of the Property; and

1.5 **Leases**. All of Borrower's rights as landlord in and to all existing and future leases and tenancies, whether written or oral and whether for a definite term or month to month or otherwise, now or hereafter demising all or any portion of the property described in <u>Sections 1.1</u> and <u>1.2</u> above, including all renewals and extensions thereof and all rents, deposits and other amounts received or receivable thereunder, and including all guaranties, supporting obligations, letters of credit (whether tangible or electronic) and letter of credit rights guaranteeing or supporting any such lease or tenancy (in accepting this Security Instrument Lender does not assume any liability for the performance of any such lease); and

1.6 **Books and Records.** All books and records of Borrower relating to the foregoing in any form.

2. <u>SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS</u>.

2.1 **Security Agreement**. To the extent any of the property described in <u>Section 1</u> is personal property, Borrower, as debtor, grants to Lender, as secured party, a security interest therein together with a security interest in all other personal property of whatsoever nature that is located on or used or to be used in connection with any of the property described in <u>Section 1</u>, and any products or proceeds of any thereof, pursuant to the Uniform Commercial Code of the State of New Jersey (the

1117492/LA -2-

"UCC"), on the terms and conditions contained herein. Borrower hereby authorizes Lender to file any financing statement, fixture filing or similar filing to perfect the security interests granted in this Security Instrument without Borrower's signature.

2.2 **Assignment of Leases and Rents**.

    2.2.1 **Absolute Assignment**. Borrower hereby absolutely and unconditionally grants, transfers, conveys, sells, sets over and assigns to Lender all of Borrower's right, title and interest now existing and hereafter arising in and to the leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements, either oral or written, now existing and hereafter arising which affect the Property, Borrower's interest therein or any improvements located thereon, together with any and all security deposits, guaranties of the lessees' or tenants' obligations (including any and all security therefor), and other security under any such leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements, and all supporting obligations, letters of credit (whether tangible or electronic) and letter of credit rights guaranteeing or supporting any of the foregoing (all of the foregoing, and any and all extensions, modifications and renewals thereof, shall be referred to, collectively, as the "Leases") and all the income, rents, issues, profits, royalties and proceeds from the Leases and any business conducted on the Property and any and all prepaid rent and security deposits thereunder (collectively, the "Rents"). Borrower hereby gives to and confers upon Lender the right to collect all Rents . The term "Rents" includes, but is not limited to all minimum rents, additional rents, percentage rents, deficiency rents, common area maintenance charges, lease termination payments, purchase option payments, refunds of any type, prepayment of rents, settlements of litigation, settlements of past due rents, and liquidated damages following default, and all proceeds payable under any policy of insurance covering loss of rents, together with any and all rights and claims of any kind that Borrower may have against any tenant under the Leases or any other occupant of the Property. This Security Instrument is intended by Lender and Borrower to create and shall be construed to create a present absolute assignment to Lender of all of Borrower's right, title and interest in and to the Leases and the Rents and shall not be deemed merely to create a security interest therein for the payment of any indebtedness or the performance of any obligations under the Loan Documents (as defined below). Borrower irrevocably appoints Lender its true and lawful attorney at the option of Lender at any time to demand, receive and enforce payment, to give receipts, releases and satisfactions and to sue, either in the name of Borrower or in the name of Lender, for all such Rents and apply the same to the obligations secured by this Security Instrument.

    2.2.2 **Revocable License to Collect**. Notwithstanding the foregoing assignment of Rents, so long as no Event of Default (as defined below) remains uncured, Borrower shall have a revocable license, to collect all Rents, and to retain the same. Upon any Event of Default, Borrower's license to collect and retain Rents shall terminate automatically and without the necessity for any notice.

    2.2.3 **Collection and Application of Rents by Lender**. While any Event of Default remains uncured: (i) Lender may at any time, without notice, in person, by agent or by court-appointed receiver, and without regard to the adequacy of any security for the obligations secured by this Security Instrument, enter upon any portion of the Property and/or, with or without taking possession thereof, in its own name sue for or otherwise collect Rents (including past due amounts); and (ii) without demand by Lender therefor, Borrower shall promptly deliver to Lender all prepaid rents, deposits relating to Leases or Rents, and all other Rents then held by or thereafter collected by Borrower, whether prior to or during the continuance of any Event of Default. Any Rents collected by or delivered to Lender may be applied by Lender against the obligations secured by this Security Instrument, less all expenses, including attorneys' fees and disbursements, in such order as Lender shall determine in its sole and absolute discretion. No application of Rents against any obligation secured by this Security Instrument or other action taken by Lender under this Section 2.2 shall be deemed or construed to cure or waive any Event of Default, or to invalidate any other action taken in response to such Event of Default, or to make Lender a Lender-in-possession of the Property.

-3-

2.2.4 **Direction to Tenants**. Borrower hereby irrevocably authorizes and directs the tenants under all Leases to pay all amounts owing to Borrower thereunder to Lender following receipt of any written notice from Lender that states that an Event of Default remains uncured and that all such amounts are to be paid to Lender. Borrower further authorizes and directs all such tenants to pay all such amounts to Lender without any right or obligation to inquire as to the validity of Lender's notice and regardless of the fact that Borrower has notified any such tenants that Lender's notice is invalid or has directed any such tenants not to pay such amounts to Lender.

3. OBLIGATIONS SECURED. This Security Instrument is given for the purpose of securing:

3.1 **Performance and Payment**. The performance of the obligations contained herein and the payment of $472,500.00 with interest thereon and all other amounts payable according to the terms of a promissory note of even date herewith made by Borrower, payable to Lender or order, and any and all extensions, renewals, modifications or replacements thereof, whether the same be in greater or lesser amounts (the "Note"), which Note may provide for one or more of the following: (a) a variable rate of interest; (b) a balloon payment at maturity; or (c) deferral of a portion of accrued interest under certain circumstances with interest so deferred added to the unpaid principal balance of the Note and secured hereby.

3.2 **Future Advances**. The repayment of any and all sums advanced or expenditures made by Lender subsequent to the execution of this Security Instrument for the maintenance or preservation of the Property or advanced or expended by Lender pursuant to any provision of this Security Instrument subsequent to its execution, together with interest thereon.

3.3 **Other Amounts,** All other obligations and amounts now or hereafter owing by Borrower to Lender under this Security Instrument, the Note or any other document, instrument or agreement evidencing, securing or otherwise relating to the loan evidenced by the Note and any and all extensions, renewals, modifications or replacements of any thereof (collectively, the "Loan Documents"); provided, however, that this Security Instrument does not and shall not in any event be deemed to, secure the obligations owing to Lender under: (a) any environmental indemnity agreement (the "Indemnity Agreement") executed in connection with such loan (or any obligations that are the substantial equivalent thereof); or (b) any guaranty of such loan.

4. REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants to Lender as follows:

4.1 **Legal Status**. Borrower and all entities having a direct or indirect interest in Borrower are duly organized and existing and in good standing under the laws of the state(s) in which Borrower and such entities are organized. Borrower is qualified do to business in New Jersey, and Borrower and such entities are qualified or licensed to do business in all other jurisdictions in which such qualification or licensing is required. Borrower's legal name is exactly as shown on page 1 hereof, and Borrower's chief executive office is located at the address shown on page 1 hereof. All organizational documents of Borrower delivered to Lender are complete and accurate in every respect.

4.2 **Authorization and Validity**. The execution and delivery of the Loan Documents have been duly authorized and the Loan Documents constitute valid and binding obligations of Borrower or the party which executed the same, enforceable in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights, or by the application of rules of equity.

4.3 **Purpose**. The loan evidenced by the Note and secured by this Security Instrument (the "Loan") is primarily for commercial, industrial or business purposes and is not primarily for personal, family or household purposes.

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 580 PAGE 6 OF 32

4.4 **Violations**. The execution, delivery and performance of the Loan Documents by Borrower do not violate the provisions of any contract or instrument by which Borrower is bound.

4.5 **Subordination**. There is no contract or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations under the Note to an obligation owed to another party.

4.6 **Litigation**. There are no pending or threatened actions, claims, investigations, suits or proceedings before any governmental authority, court or administrative agency which may adversely affect: (i) the financial condition or operations of Borrower or any Guarantor; or (ii) the value, marketability or intended use of the Property, other than those previously disclosed in writing by Borrower to Lender.

4.7 **Financial Statements**. The financial statements of Borrower, each general partner of Borrower (if Borrower is a partnership), each member of Borrower (if Borrower is a limited liability company) and each Guarantor, if any, previously delivered to Lender in connection with the Loan: (i) are materially complete and correct; and (ii) disclose all liabilities that are required to be reflected or reserved against. Since the date of such financial statements, there has been no material adverse change in such financial condition, nor have any assets or properties reflected on such financial statements been sold, transferred, assigned, mortgaged, pledged or encumbered except as previously disclosed in writing to Lender and approved in writing by Lender.

4.8 **Reports**. All reports, documents, instruments and information delivered to Lender in connection with the Loan: (i) are correct and sufficiently complete to give Lender accurate knowledge of their subject matter; and (ii) do not contain any misrepresentation of a material fact or omission of a material fact which omission makes the provided information misleading.

4.9 **Leases**. (i) Borrower is the sole owner of the entire lessor's interest in the Leases; (ii) the Leases are all in full force and effect, and are the valid, binding and enforceable obligations of Borrower and the applicable tenant or lessee thereunder; (iii) no material breach or default by any tenant exists under any Lease, except as previously disclosed in the certified rent roll delivered to and approved by Lender; (iv) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified rent roll delivered to and approved by Lender; (v) none of the Rents have been assigned or otherwise pledged or hypothecated except to Lender; (vi) none of the Rents under Commercial Leases (as defined below) have been collected for more than one (1) month in advance; (vii) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (viii) there exists no offset or defense to the payment of any portion of the Rents; (ix) no Lease contains an option to purchase, right of first refusal to purchase, expansion right, or any other similar provision; (x) no person or entity has any possessory interest in, or right to occupy the Property, except under and pursuant to a Lease; and (xi) Borrower maintains all tenant security deposits in compliance with applicable law.

4.10 **Condition of Property**. Except as shown in the property condition survey or other engineering reports, if any, previously delivered to or obtained by Lender, the Property is in good condition and repair and is free from any damage that would materially and adversely affect the value, marketability or intended use of the Property.

4.11 **Hazardous Materials**. Except as previously disclosed in writing by Borrower to Lender, the Property is not and has not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of oil or other petroleum products, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials (collectively, "Hazardous Materials"). No Hazardous Materials Claims (defined below) are pending or threatened.

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 581 PAGE 7 OF 32

4.12 **Encroachments**. Except as shown in the survey, if any, previously delivered to Lender, none of the improvements on the Property lies outside of the boundaries or building restriction lines of the Property and no improvements on adjoining properties encroach upon the Property.

4.13 **Compliance With Laws**. The Property complies in all material respects with all applicable federal, state and local laws, rules and regulations.

4.14 **Permits**. Borrower holds all permits, franchises, licenses and other authorizations necessary to enable Borrower to own and operate Property in compliance with applicable law.

4.15 **Condemnation**. No proceeding for the total or partial condemnation of the Property is pending or threatened.

4.16 **Collateral**. Borrower has good title to the existing Collateral, free and clear of all liens and encumbrances except those, if any, previously disclosed to Lender by Borrower in writing specifically referring to this representation and warranty.

4.17 **Separate Tax Parcel(s)**. The Property is assessed for real estate tax purposes as one or more wholly independent tax parcels, separate from any other real property, and no other real property is assessed and taxed together with the Property or any portion thereof.

4.18 **Utilities; Water; Sewer**. The Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service. The Property is served by public water and sewer systems.

4.19 **Property Management**. If the Property is managed by a person other than Borrower then Borrower has delivered a complete and correct copy of the management agreement for the Property to Lender as in effect on the date hereof (the "Management Agreement"), and the Property is managed by the person or entity specified therein (the "Manager"). Except for the Management Agreement, if any, no management agreement has been executed and remains unterminated with respect to the Property.

4.20 **ERISA Matters**. Borrower is not an employee benefit plan as defined in Section 3.(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which is subject to Title I of ERISA, nor a Plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to individually and collectively as "Plan"). Borrower's assets do not constitute "plan assets" of any plan within the meaning of Department of Labor Regulation Section 2510.3-101. Borrower will not transfer or convey the Property to a Plan or to a person or entity whose assets constitute such "plan assets", and Borrower will not be reconstituted as a Plan or as an entity whose assets constitute "plan assets". No Lease is with a Plan or an entity whose assets constitute such "plan assets", and Borrower will not enter into any Lease with a Plan or an entity whose assets constitute such "plan assets". With respect to the Loan, Borrower is acting on Borrower's own behalf and will not on account of or for the benefit of any Plan.

4.21 **OFAC; Anti-Corruption Laws**. Neither Borrower nor any Guarantor nor, to the knowledge of Borrower or any Guarantor, any director, officer, employee, agent, Affiliate or representative of Borrower or any Guarantor is a Prohibited Person. Borrower and Guarantors have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the U.K. Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures (which need not be written) designed to promote and achieve compliance with such laws. As used herein, "Prohibited Person" means any individual or entity that is (a) currently the subject or target of any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her

1117492/LA

-6-

Majesty's Treasury ("HMT") other relevant sanctions authority ("Sanctions"), (b) included on the List of Specially Designated Nationals of the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the HMT Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority, or (c) any individual or entity that is owned or controlled by, acting on behalf of, or an Affiliate of, a person listed in the previous clause (a) or (b), or (d) located, organized or resident in any country or territory to the extent that such country or territory itself is the subject any Sanction. As used herein, "Affiliate, means, with respect to any subject person, any other person that directly or indirectly controls, is controlled by, or is under common control with such subject person.

5. **COVENANTS.** Borrower covenants to Lender as follows:

5.1 **Preservation of Lien.** Borrower will preserve and protect the priority of this Security Instrument as a first lien on the Property. If Borrower fails to do so, Lender may take any and all actions necessary or appropriate to do so and all sums expended by Lender in so doing shall be treated as part of the obligations secured by this Security Instrument, shall be paid by Borrower upon demand by Lender and shall bear interest at the highest rate borne by any of the obligations secured by this Security Instrument.

5.2 **Repair and Maintenance of Property.** Borrower will keep the Property in good condition and repair, which duty shall include but is not limited to cleaning, painting, landscaping, repairing, and refurbishing of the Property; will complete and not remove or demolish, alter, or make additions to any building or other improvement that is part of the Property, or construct any new structure on the Property, without the express written consent of Lender, to be given or withheld in Lender's sole and absolute discretion; will underpin and support when necessary any such building or other improvement and protect and preserve the same; will complete or restore promptly and in good and workmanlike manner any such building or other improvement that may be damaged or destroyed and pay when due all claims for labor performed and materials furnished therefor; will not commit, suffer, or permit any act upon the Property in violation of law; and will do all other acts that from the character or use of the Property may be reasonably necessary for the continued operation of the Property in a safe and legal manner, the specific enumerations herein not excluding the general.

5.3 **Insurance.**

5.3.1 **Insurance Coverage.** Borrower will provide and maintain, as further security for the faithful performance of the obligations secured by this Security Instrument, such property, liability, rental income interruption, flood and other insurance coverage as Lender may require from time to time. All such insurance must be acceptable to Lender in all respects including but not limited to the amount of coverage, policy forms, endorsements, identity of insurance companies and amount of deductibles.

5.3.2 **Acknowledgment of Insurance Requirements.** Lender's initial insurance requirements are set forth in the acknowledgment of insurance requirements dated on or about the date of this Security Instrument and entered into in connection with the Loan.

5.3.3 **Endorsement in Favor of Lender.** All policies of insurance on the Property, whether or not required by the terms of this Security Instrument (including but not limited to earthquake/earth movement insurance), shall name Lender as Lender and loss payee pursuant to a mortgage endorsement on a form acceptable to Lender.

5.3.4 **Changes in Insurance Requirements.** Lender may change its insurance requirements from time to time throughout the term of the obligations secured by this Security Instrument by giving written notice of such changes to Borrower. Without limiting the generality of the foregoing, Borrower shall from time to time obtain such additional coverages or make such increases in the amounts of existing coverage as may be required by written notice from Lender. Lender reserves the

1117492/LA

-7-

right, in its reasonable discretion, to increase the amount of the required coverages, require insurance against additional risks, or withdraw approval of any insurance company at any time.

5.3.5 **Control of Proceeds**. Lender shall have the right to control or direct the proceeds of all policies of insurance on the Property, whether or not required by the terms of this Security Instrument, as provided in Section 5.3.6 below, and all proceeds of all such policies are hereby assigned to Lender as security for the obligations secured by this Security Instrument. Borrower shall be responsible for all uninsured losses and deductibles.

5.3.6 **Damage and Destruction**.

(a) **Borrower's Obligations**. In the event of any damage to or loss or destruction of the Property (a "Casualty"): (i) if it could reasonably be expected to cost more than $25,000 to repair the Casualty, Borrower shall give prompt written notice of the Casualty to Lender and to Borrower's insurer, and shall make a claim under each insurance policy providing coverage therefor; (ii) Borrower shall take such actions as are necessary or appropriate to preserve and protect the Property; (iii) if the aggregate proceeds of any and all insurance policies insuring the Property, whether or not required by this Security Instrument, that are payable as a result of the Casualty (collectively, the "Insurance Proceeds") could reasonably be expected to exceed $25,000, or if a Default exists, Borrower shall take such actions as are necessary or appropriate to ensure that all Insurance Proceeds are paid to Lender forthwith to be held by Lender until applied to the obligations secured hereby or disbursed in accordance with this Section 5.3.6; and (iv) unless otherwise instructed by Lender, regardless of whether the Insurance Proceeds, if any, are sufficient for the purpose, Borrower shall promptly commence and diligently pursue to completion in a good, workmanlike and lien-free manner the restoration, replacement and rebuilding of the Property as nearly as possible to its value, condition and character immediately prior to the Casualty (collectively, the "Restoration"). If the Restoration will cost more than $25,000 to repair, Borrower shall submit the proposed plans and specifications for the Restoration, and all construction contracts, architect's contracts, other contracts in connection with the Restoration, and such other documents as Lender may reasonably request to Lender for its review and approval. Borrower shall not begin the Restoration unless and until Lender gives its written approval of such plans, specifications, contracts and other documents, with such revisions as Lender may reasonably require. Notwithstanding the foregoing, Lender shall not be responsible for the sufficiency, completeness, quality or legality of any such plans, specifications, contracts or other documents. Borrower shall pay, within ten days after demand by Lender, all costs reasonably incurred by Lender in connection with the adjustment, collection and disbursement of Insurance Proceeds pursuant to this Security Instrument or otherwise in connection with the Casualty or the Restoration.

(b) **Lender's Rights**. Lender shall have the right and power to receive and control all Insurance Proceeds required to be paid to it pursuant to Section 5.3.6(a)(iii) above. Borrower hereby authorizes and empowers Lender, in its own name or as attorney-in-fact for Borrower (which power is coupled with an interest and is irrevocable so long as this Security Interest remains of record), to make proof of loss, to settle, adjust and compromise any claim under insurance policies on the Property, to appear in and prosecute any action arising from such insurance policies, to collect and receive Insurance Proceeds, and to deduct therefrom Lender's expenses incurred in the adjustment, collection and disbursement of such Insurance Proceeds or otherwise in connection with the Casualty or the Restoration. Each insurance company concerned is hereby irrevocably authorized and directed to make payment of all Insurance Proceeds directly to Lender. Notwithstanding anything to the contrary, Lender shall not be responsible for any such insurance, the collection of any Insurance Proceeds, or the insolvency of any insurer.

(c) **Application of Proceeds**. If, at any time while Lender holds any Insurance Proceeds, an Event of Default exists or Lender determines in its reasonable discretion that the security for the obligations secured hereby is impaired, Lender shall have the option, in its sole discretion, to apply the Insurance Proceeds to the obligations secured hereby in such order as Lender may determine (or to hold such proceeds for future application to those obligations). Without limiting the generality of the foregoing, Lender's security will be deemed to be impaired if: (i) an Event of Default

1117492/LA                                                 -8-

exists; (ii) Borrower fails to satisfy any condition precedent to disbursement of Insurance Proceeds to pay the cost of the Restoration within a reasonable time; or (iii) Lender determines in its reasonable discretion that it could reasonably be expected that (A) Borrower will not have sufficient funds to complete the Restoration and timely pay all expenses of the Property and all payments due under the Note and the other Loan Documents through the completion of the Restoration and any leaseup period thereafter, (B) the rental income from the Property will be insufficient to timely pay all expenses of the Property and payments due under the Note and the other Loan Documents on an ongoing basis after completion of the Restoration, or (C) the Restoration cannot be completed at least six months prior to the maturity date of the Note and within one year after the date of the Casualty.

(d)     **Disbursement of Proceeds**.  If Lender is not entitled to apply the Insurance Proceeds to the obligations secured hereby, Lender (or at Lender's election, a disbursing or escrow agent selected by Lender and whose fees shall be paid by Borrower) shall disburse the Insurance Proceeds for the Restoration from time to time as the Restoration progresses, but only after satisfaction, at Borrower's expense, of such conditions precedent to such disbursements as Lender may reasonably require including but not limited to the following:  (i) Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender of the estimated cost of the Restoration; (ii) Lender shall have approved the plans, specifications and contracts for the Restoration as required by Section 5.3.6(a); (iii) Borrower shall have delivered to Lender funds in addition to the Insurance Proceeds in an amount sufficient in Lender's reasonable judgment to complete and fully pay for the Restoration; (iv) Borrower shall have delivered to Lender such building permits, other permits, architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, plats of survey and other evidence of cost, payment and performance as Lender may reasonably require and approve; and (v) if required by Lender, Borrower shall have entered into an agreement providing in greater detail for the Restoration, the disbursement of Insurance Proceeds and related matters.  No payment made prior to the final completion of the Restoration shall exceed ninety percent of the value of the work performed and materials incorporated into the Property from time to time, as such value is determined by Lender in its reasonable judgment.  Disbursements may, at Lender's election, be made on a percentage of completion basis or on such other basis as is acceptable to Lender.  Disbursements shall be subject to Borrower's delivery of such lien waivers as Lender may require, and otherwise on terms and subject to conditions acceptable to Lender.  From time to time after commencement of the Restoration, if so requested by Lender, Borrower shall deposit with Lender funds in excess of the Insurance Proceeds which, together with the Insurance Proceeds and all funds previously deposited with Lender in connection with the Restoration, must at all times be at least sufficient in the reasonable judgment of Lender to pay the entire unpaid cost of the Restoration.  Funds so deposited by Borrower may at Lender's option be disbursed prior to the disbursement of Insurance Proceeds.  Lender may retain a construction consultant to inspect the Restoration and related matters on Lender's behalf and to advise Lender with respect thereto and Borrower shall pay the cost thereof; provided that neither Borrower nor any other person or entity other than Lender shall have any right to rely on any inspection or advice of such consultant.  Such consultant shall not be the agent of Lender and shall not have the power to bind Lender in any way.  Any surplus Insurance Proceeds or other funds held by Lender pursuant to this Section 5.3.6 that may remain after payment of all costs of the Restoration shall be paid to Borrower (or to such other person or entity as Lender reasonably determines is entitled thereto) so long as no Default then exists.  No interest shall be allowed to Borrower on account of any Insurance Proceeds or other funds held by Lender pursuant to this Section 5.3.6, but at Borrower's request, Lender will deposit such amounts into a blocked interest-bearing account with Lender over which Lender has sole possession, authority and control, in which Lender has a perfected first-priority security interest to secure the obligations secured by this Security Instrument, and otherwise on terms and conditions satisfactory to Lender in its sole discretion.  Notwithstanding the above, if an Event of Default exists prior to full disbursement of the Insurance Proceeds and any other funds held by Lender pursuant to this Section 5.3.6, any undisbursed portion thereof may, at Lender's option, be applied against the obligations secured by this Security Instrument, whether or not then due, in such order and manner as Lender shall select.

(e)     **Effect on the Indebtedness**.  Any reduction in the obligations secured hereby resulting from the application of Insurance Proceeds or other funds pursuant to this Section 5.3.6 shall be deemed to take effect only on the date of such application; provided that, if any

1117492/LA                                                          -9-

Insurance Proceeds are received after the Property is sold in connection with a judicial or nonjudicial foreclosure of this Security Instrument, or is transferred by deed in lieu of such foreclosure, notwithstanding any limitation on Borrower's liability contained herein or in the Note, the purchaser at such sale (or the grantee under such deed) shall have the right to receive and retain all such Insurance Proceeds and all unearned premiums for all insurance on the Property. No application of Insurance Proceeds or other funds to the obligations secured hereby shall result in any adjustment in the amount or due dates of installments due under the Note. No application of Insurance Proceeds to the obligations secured hereby shall, by itself, cure or waive any Default or any notice of default under this Security Instrument or invalidate any act done pursuant to such notice or result in the waiver of any collateral securing the Note.

5.4 **Condemnation, Etc**. In the event that the Property, or any part or appurtenance thereof or right or interest therein is taken or threatened to be taken by reason of any public or private improvement or purpose, condemnation proceeding (including change of grade), or in any other manner (a "Taking"), Borrower shall give prompt written notice thereof to Lender and shall take such actions as are necessary or appropriate to preserve and protect the Property. Any and all awards of damages, whether paid as a result of judgment or prior settlement, in connection with any Taking, or for injury to any portion of the Property ("Awards"), are hereby assigned and shall be paid to Lender which may apply or disburse such Awards in the same manner, on the same terms, subject to the same conditions, to the same extent, and with the same effect as provided in Section 5.3.6 above for disposition of Insurance Proceeds. Without limiting the generality of the foregoing, if the Taking results in a loss of the Property to an extent that Lender determines in its sole and absolute discretion renders or is likely to render the Property not economically viable, or if Lender in its sole and absolute discretion determines that its security is otherwise impaired, Lender may apply the Awards to reduce the unpaid obligations secured hereby in such order as Lender in its sole and absolute discretion may determine, and without any adjustment in the amount or due dates of installments due under the Note. If so applied, any Awards in excess of the unpaid balance of the Note and other sums due to Lender shall be paid to Borrower or Borrower's assignee. Lender shall in no case be obligated to see to the proper application of any amount paid over to Borrower. Such application or release shall not cure or waive any Default, Event of Default or notice of default hereunder or invalidate any act done pursuant to such notice. In connection with any Taking Lender may, at its option, commence, appear in and prosecute, in its own name, any action or proceeding, or make any reasonable compromise or settlement in connection with such Taking, and may obtain all Awards or other relief therefor, and Borrower agrees to pay Lender's costs and reasonable attorneys' fees incurred in connection therewith, provided, however, that Lender shall have no obligation to take any action in connection with any Taking.

5.5 **Right of Inspection**. Borrower shall permit Lender or its agents or independent contractors (including, but not limited to, appraisers, environmental consultants and construction consultants), at all reasonable times, to enter upon and inspect the Property. Borrower agrees to pay all of Lender's costs and expenses incurred in connection with any inspection of the Property, including expenses for environmental reports and appraisals.

5.6 **Compliance with Laws, Etc.; Preservation of Licenses**. Borrower shall comply in all material respects with (a) all laws, statutes, ordinances, rules, regulations, licenses, permits, approvals, orders, judgments and other requirements of governmental authorities relating to the Property or Borrower's use thereof, and (b) all easements, licenses and agreements relating to the Property or Borrower's use thereof. Borrower shall observe and comply with all requirements necessary to the continued existence and validity of all rights, licenses, permits, privileges, franchises and concessions relating to any existing or presently contemplated use of the Property, including but not limited to any zoning variances, special exceptions and nonconforming use permits.

5.7 **Further Assurances**. Borrower will, at its expense, from time to time execute and deliver any and all such instruments of further assurance and other instruments and do any and all such acts, or cause the same to be done, as Lender deems necessary or advisable to grant the Property to Lender or to carry out more effectively the purposes of this Security Instrument.

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 586 PAGE 12 OF 32

5.8 **Legal Actions**. Borrower will appear in and defend any action or proceeding before any court or administrative body purporting to affect the security hereof or the rights or powers of Lender; and will pay all costs and expenses, including cost of evidence of title, title insurance premiums and any fees of attorneys, appraisers, environmental inspectors and others, incurred by Lender, in a reasonable sum, in any such action or proceeding in which Lender may appear, in any suit brought by Lender to foreclose this Security Instrument and in any foreclosure sale under this Security Instrument.

5.9 **Taxes, Assessments and Other Liens**. Borrower will pay prior to delinquency all taxes, assessments, encumbrances, charges, and liens with interest, on the Property or any part thereof, including but not limited to any tax on or measured by rents of the Property, the Note, this Security Instrument, or any obligation or part thereof secured hereby.

5.10 **Expenses**. Borrower will pay all costs, fees and expenses reasonably incurred by Lender in connection with this Security Instrument.

5.11 **Repayment of Expenditures**. Borrower will pay within five (5) days after written demand all amounts secured by this Security Instrument, other than principal of and interest on the Note, with interest from date of expenditure at the rate of interest borne by the Note and the repayment thereof shall be secured by this Security Instrument.

5.12 **Financial and Operating Information**. Within ninety (90) days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender the following in such form as Lender may require: (a) an itemized statement of income and expenses for Borrower's operation of the Property for that fiscal year; and (b) a rent schedule for the Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, all security deposits held (and the institution in which they are held) and any related information requested by Lender.

In addition, within twenty (20) days after written request by Lender, Borrower shall furnish to Lender such financial statements and other financial, operating and ownership information about the Property, Borrower, owners of equity interests in Borrower, and guarantors of the obligations secured hereby (each such person a "Guarantor"), as Lender may require.

If Borrower fails to provide Lender with any of the financial and operating information required to be provided under this Section within the time periods required under this Section and such failure continues after Lender has provided Borrower with thirty (30) days' notice and opportunity to cure such failure, Borrower shall pay to Lender, as liquidated damages for the extra expense in servicing the Loan, Five Hundred Dollars ($500) on the first day of the month following the expiration of such thirty (30)-day period and One Hundred Dollars ($100) on the first day of each month thereafter until such failure is cured. All such amounts shall be secured by this Security Instrument. Payment of such amounts shall not cure any Default or Event of Default resulting from such failure.

5.13 **Sale, Transfer, or Encumbrance of Property**.

5.13.1 **Encumbrances; Entity Changes**. Except as otherwise provided below, Borrower shall not, without the prior written consent of Lender, to be given or withheld in Lender's sole and absolute discretion, further encumber the Property or any interest therein, or cause or permit any change in the entity, ownership, or control of Borrower without first repaying in full the Note and all other sums secured hereby.

5.13.2 **Sales, Transfers, Conveyances**. Except as otherwise provided below, Borrower shall not, without the prior written consent of Lender, to be given or withheld in Lender's sole and absolute discretion, sell, transfer, or otherwise convey the Property or any interest therein, voluntarily or involuntarily, without first repaying in full the Note and all other sums secured hereby.

1117492/LA

-11-

**5.13.3  Unconsented Transfers.**  In each instance in which a sale, transfer or other conveyance of the Property, or any change in the entity, ownership, or control of Borrower, occurs without Lender's prior written consent thereto having been given, and regardless of whether Lender elects to accelerate the maturity date of the Note (any of the foregoing events is referred to as an "Unconsented Transfer"), Borrower and its successors shall be jointly and severally liable to Lender for the payment of a fee (the "Unconsented Transfer Fee") of two percent (2.0%) of the unpaid principal balance of the Note as of the date of such Unconsented Transfer.  The Unconsented Transfer Fee shall be due and payable upon written demand therefor by Lender, and shall be secured by this Security Instrument; provided, however, that payment of the Unconsented Transfer Fee shall not cure any Event of Default resulting from the Unconsented Transfer.

**5.13.4  No Waiver.**  Lender's waiver of any of the Unconsented Transfer Fee or any other amount payable hereunder, in whole or in part for any one sale, transfer or other conveyance shall not preclude the imposition thereof in connection with any other sale, transfer or other conveyance.

**5.13.5  Permitted Transfers.**  Notwithstanding the foregoing and notwithstanding Section 5.14.2, Lender's consent will not be required for any Permitted Transfer (as defined below), so long as all Transfer Requirements (as defined below) applicable to such Permitted Transfer are timely satisfied.  As used herein, the following terms have the meanings set forth below:

**"Permitted Transfer"** means:

(a)  The transfer of not more than twenty-five percent (25%) in the aggregate during the term of the Note of the Equity Interests (as defined below) in any Borrower (or in any entity that owns, directly or indirectly through one or more intermediate entities, an Equity Interest in any Borrower), in addition to any transfers permitted under subparagraphs (b) or (c) of this definition (a "Minority Interest Transfer");

(b)  A transfer that occurs by devise, descent or operation of law upon the death of a natural person (a "Decedent Transfer"); or

(c)  A transfer of interests in the Property, in Borrower or in any entity that owns, directly or indirectly through one or more intermediate entities, an Equity Interest in Borrower, to non-minor immediate family members (i.e., the parents, spouse, siblings, children and other lineal descendants, and the spouses of parents, siblings, children and other lineal descendants) of the transferor or to one or more trusts established for the benefit of the transferor and/or such immediate family members of the transferor (an "Estate Planning Transfer").

**"Transfer Requirements"** means, with respect to any Permitted Transfer, all of the following that apply to that transfer:

(a)  In the case of any Permitted Transfer, none of the persons or entities liable for the repayment of the Loan shall be released from such liability.

(b)  In the case of any Minority Interest Transfer or Estate Planning Transfer, there shall be no change in the individuals exercising day-to-day powers of decision-making, management and control over either Borrower or the Property unless Lender has given its prior written consent to such change in its sole discretion.  In the case of a Decedent Transfer, any new individual exercising such powers must be satisfactory to Lender in its sole discretion.

(c)  In the case of a Decedent Transfer, if the decedent was a Borrower or Guarantor, within 30 days after written request by Lender, one or more other persons or entities having credit standing and financial resources equal to or better than those of the decedent, as determined by Lender in its reasonable discretion, shall assume or guarantee such loan by executing and delivering to Lender a guaranty or assumption agreement and an environmental indemnity agreement, each

1117492/LA

-12-

satisfactory to Lender, providing Lender with recourse substantially identical to that which Lender had against the decedent and granting Lender liens on any and all interests of the transferee in the Property.

(d)     In the case of any Estate Planning Transfer that results in a transfer of an interest in the Property or in a change in the trustee of any trust owning an interest in the Property, the transferee or new trustee (in such new trustee's fiduciary capacity) shall, prior to the transfer, execute and deliver to Lender an assumption agreement satisfactory to Lender, providing Lender with recourse substantially identical to that which Lender had against the transferor or predecessor trustee and granting Lender liens on any and all interests of the transferee or the new trustee in the Property.

(e)     In the case of any Permitted Transfer that results in a transfer of an interest in the Property, Lender shall be provided, at no cost to Lender, with an endorsement to its title insurance policy insuring the lien of this Security Instrument, which endorsement shall insure that there has been no impairment of that lien or of its priority.

(f)     In the case of any Permitted Transfer, Borrower or the transferee shall pay all costs and expenses reasonably incurred by Lender in connection with that Permitted Transfer, together with any applicable fees in accordance with Lender's fee schedule in effect at the time of the Permitted Transfer, and shall provide Lender with such information and documents as Lender reasonably requests in order to make the determinations called for by this Security Instrument and to comply with applicable laws, rules and regulations.

(g)     No Default or Event of Default shall exist.

"**Equity Interest**" means the direct or indirect partnership interests in Borrower, if Borrower is a partnership, the direct or indirect member interests in Borrower, if Borrower is a limited liability company, or the direct or indirect shares of stock of Borrower, if Borrower is a corporation, or any similar or analogous ownership interests if Borrower is any other type of entity.

5.14    **Borrower Existence**. If Borrower is a corporation, partnership, limited liability company or other entity, Lender is making the Loan in reliance on Borrower's continued existence, ownership and control in its present form. Borrower will not alter its name, jurisdiction of organization, structure, ownership or control without the prior written consent of Lender and will do all things necessary to preserve and maintain said existence and to ensure its continuous right to carry on its business. If Borrower is a partnership, Borrower will not permit the addition, removal or withdrawal of any general partner without the prior written consent of Lender. The withdrawal or expulsion of any general partner from Borrower partnership shall not in any way affect the liability of the withdrawing or expelled general partner hereunder or on the Note.

5.15    **Information for Participants, Etc.** Borrower agrees to furnish such information and confirmation as may be required from time to time by Lender on request of potential loan participants and assignees and agrees to make adjustments in this Security Instrument, the Note, and the Loan Documents to accommodate such participant's or assignee's requirements, provided that such requirements do not vary the economic terms of the Loan, Borrower hereby authorizes Lender to disclose to potential participants and assignees any information in Lender's possession with respect to Borrower and the Loan.

5.16    **Tax and Insurance Impounds**.

5.16.1    **Impounds**. In addition to the payments required by the Note, Borrower agrees to pay Lender, at Lender's request, such sums as Lender may from time to time estimate will be required to pay, at least one month before delinquency, the next due taxes, assessments, insurance premiums, and similar charges affecting the Property, less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such taxes, assessments and premiums will become delinquent, such sums to be held by Lender without interest or other income to

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 589 PAGE 15 OF 32

Borrower to pay such taxes, assessments and premiums. Should this estimate as to taxes, assessments and premiums prove insufficient, Borrower upon demand agrees to pay Lender such additional sums as may be required to pay them before delinquent.

5.16.2 **Application**. If the total of the payments described in <u>Section 5.16.1</u> of this Section (collectively, the "<u>Impounds</u>") in any one year shall exceed the amounts actually paid by Lender for taxes, assessments and premiums, such excess may be credited by Lender on subsequent payments under this section. At any time after the occurrence and during the continuance of an Event of Default and at or prior to the foreclosure sale, Lender may apply any balance of funds it may hold pursuant to this Section to any amount secured by this Security Instrument and in such order as Lender may elect. If Lender does not so apply such funds at or prior to the foreclosure sale, the purchaser at such sale shall be entitled to all such funds. If Lender acquires the Property in lieu of realizing on this Security Instrument, the balance of funds it holds shall become the property of Lender. Any transfer in fee of all or a part of the Property shall automatically transfer to the grantee all or a proportionate part of Borrower's rights and interest in the fund accumulated hereunder.

5.16.3 **Tax Reporting Service**. Lender may, but need not, contract with a tax reporting service covering the Property. Borrower agrees that Lender may rely on the information furnished by such tax service and agrees to pay the cost of that service within 30 days after receipt of a billing for it.

5.16.4 **Limited Waiver**. Notwithstanding the foregoing, Lender will not require Borrower to deposit the Impounds as provided in <u>Section 5.16.1</u> of this Section so long as: (i) the Property is owned in its entirety by the original Borrower named below (and not by any successor or transferee Borrower) and there is no change in the individuals exercising day-to-day powers of decision making, management and control over either Borrower or the Property (regardless of whether Lender has consented to any such transfer or change); (ii) Borrower pays, prior to delinquency, all payments of taxes, assessments, insurance premiums and other amounts that would otherwise be paid from the Impounds and, if required by Lender, Borrower provides Lender with proof of such payment; and (iii) no Event of Default occurs (regardless of whether it is later cured). If at any time Borrower fails to meet any of the foregoing requirements, Lender may at any time thereafter require the payment of all Impounds upon ten days written notice to Borrower.

5.17 **Leasing Matters**.

5.17.1 **Residential Lease Covenants**. Borrower shall keep and perform, in all material respects, all terms, conditions and covenants required to be performed by lessor under Leases of individual dwelling units ("Residential Leases"), including, without limitation, Borrower's obligations pertaining to the maintenance and disposition of security deposits. Borrower shall, in all material respects, enforce the Residential Leases and all remedies available to Borrower against the lessees thereunder in case of default under the Residential Leases by lessees. All Residential Leases shall have initial terms of not less than six (6) months and not more than twenty-four (24) months. All Residential Leases shall be on forms approved by Lender in its sole and absolute discretion. Borrower shall not enter into any Residential Lease with any Guarantor or with any person that owns or controls Borrower, any Guarantor, or any entity that directly or indirectly owns, controls, is controlled by, or is under common control with Borrower or any Guarantor.

5.17.2 **Commercial Lease Covenants; Retenanting Reserve**. Borrower shall not alter, modify, amend or change the terms of any of the Leases of portions of the Property other than individual dwelling units (such Leases, "Commercial Leases") or give any consent or permission or exercise any option required or permitted by the terms thereof or waive any obligation required to be performed by any lessee or execute, cancel or terminate any of the Leases or accept a surrender thereof or enter into Leases after the date hereof without the prior written consent of Lender, to be given or withheld in Lender's sole and absolute discretion. Borrower shall deliver to Lender, promptly upon receipt thereof, copies of any and all demands, claims and notices of default received by Borrower from any lessee under any of the Leases. Borrower shall keep and perform, in all material respects, all terms,

1117492/LA                                                         -14-

conditions and covenants required to be performed by lessor under the Leases. Borrower shall, in all material respects, enforce the Leases and all remedies available to Borrower against the lessees *thereunder in case of default* under the Leases by lessees. Borrower shall forthwith pay to Lender any sums received by Borrower in consideration of any full or partial termination, modification or amendment of any Lease or any release or discharge of any tenant under any Lease from any obligation thereunder and any such sums received by Borrower shall be held in trust by Borrower for such purpose. Notwithstanding the foregoing, so long as no Event of Default exists, the portion of any such sum received by Borrower with respect to any Lease that is less than five percent (5%) of the original amount of the Note shall be payable to Borrower. All such sums received by Lender with respect to any Lease *shall be deemed a reserve* (the "Retenanting Reserve") for the costs of retenanting the space affected by the termination, modification or amendment and shall be deposited by Lender into an account designated by, pledged to, and under the sole control of Lender. Borrower hereby grants Lender a security interest in such account and in all funds from time to time on deposit therein as collateral security for all obligations secured by this Security Instrument. If no Event of Default exists, Lender shall release the Retenanting Reserve to Borrower from time to time as necessary to pay or reimburse Borrower for such tenant improvements, brokerage commissions and other leasing costs as may be required to retenant the *affected space; provided, however, Lender shall have received* and approved each of the following for each tenant for which such costs were incurred: (a) Borrower's written request for such release, including the name of the tenant, the location and net rentable area of the space and a description and cost breakdown of the tenant improvements or other leasing costs covered by the request; (b) Borrower's certification that any tenant improvements have been completed lien-free and in a workmanlike manner; (c) a fully executed Commercial Lease, or extension or renewal of the current Commercial Lease as approved by Lender (or otherwise permitted as provided below); (d) an estoppel certificate executed by the *tenant including its acknowledgement that all tenant improvements* have been satisfactorily completed; and (e) such other information with respect to such costs as Lender may require. Following the retenanting of all affected space (including, without limitation, the completion of all tenant improvements), and provided no Event of Default exists, Lender shall release any remaining Retenanting Reserve relating to the affected space to Borrower. Borrower shall construct all tenant improvements in a workmanlike manner and in accordance with all applicable laws, ordinances, rules and regulations. Borrower shall furnish to Lender a true and complete copy of each Commercial Lease, extension, renewal, amendment or modification *of lease, hereafter made by Borrower with respect to* space in the Property within thirty (30) days after delivery of each such Commercial Lease, extension, renewal, amendment or modification by the parties thereto.

       5.17.3 **Tenant Estoppel Certificates**. Within 30 days after request by Lender, Borrower shall deliver to Lender and to any party designated by Lender, estoppel certificates relating to the Commercial Leases executed by Borrower and by each of the tenants party thereto, in form and substance acceptable to Lender; provided, however, *if any tenant party to a Commercial Lease shall fail* or refuse to so execute and deliver any such estoppel certificate upon request, Borrower shall use reasonable efforts to cause such tenant to execute and deliver such estoppel certificate but such tenant's continued failure or refusal to do so, despite Borrower's reasonable efforts, shall not constitute a Default by Borrower under this Section.

       5.17.4 **Right of Subordination**. Notwithstanding anything in this Security Instrument to the contrary, Lender may, upon *written notice to Borrower, elect to: (a) exclude from the* assignment provided in this Security Instrument any of the Commercial Leases as specified in such notice so that the interest under such specified Commercial Lease is not assigned to Lender; (b) subordinate the lien and other terms and provisions of this Security Instrument to any of the Commercial Leases as indicated in such notice to Borrower; and (c) require Borrower to use best efforts to obtain a subordination, nondisturbance and attornment agreement, in form and substance approved by Lender, from any of the lessees under any of the Leases as indicated in such notice to Borrower.

       5.17.5 **Letters of Credit**. Borrower shall notify Lender in writing prior to becoming the beneficiary under any letter of credit supporting any of the Commercial Leases, or *otherwise in connection with the Property*, and will take all actions, and execute all documents, necessary or appropriate to give Lender control (as defined in the Uniform Commercial Code, as enacted by any

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 591 PAGE 17 OF 32

relevant jurisdiction, including but not limited to such jurisdiction's version of Section 9407 thereof) of such letter of credit and all letter of credit rights thereunder and, if so required by Lender, to constitute Lender the transferee beneficiary of such letter of credit.

5.17.6 **Security Deposits.** Borrower shall maintain all security deposits collected from tenants or others with respect to the Property in accordance with all applicable legal requirements.

5.17.7 **Leasing Uses.** Notwithstanding anything to the contrary above, Borrower shall not enter into any Residential Leases unless such use is permitted pursuant to applicable law and the primary use of the Property is for Residential Leases or for mixed use including *Residential* Leases, and Borrower shall not enter into any Commercial Leases unless such use is permitted pursuant to applicable law and the primary use of the Property is for Commercial Leases or mixed uses including *Commercial Leases.*

5.18 **Condominium and Cooperative Provisions.** If the Property is not subject to a recorded condominium or cooperative regime on the date of this Security Instrument, Borrower will not subject the Property or any portion thereof to such a regime without the written consent of Lender, which consent may be granted or denied in Lender's sole discretion and, if granted, may be subject to such requirements as Lender may impose including but not limited to Borrower providing Lender with such title insurance endorsements and other documents as Lender may require. *If the Property is subject to a* condominium regime on the date of this Security Instrument: (a) Borrower represents and warrants that none of the condominium units and no portion of the common elements in the Property have been sold, *conveyed or encumbered or are subject to any agreement to convey or encumber;* (b) Borrower shall not in any way sell, convey or encumber or enter into a contract or agreement to sell, convey or encumber any condominium unit or any of the common elements of the Property unless expressly agreed to in writing by Lender; (c) Borrower shall operate the Property solely as a rental property; and (d) the Property granted, conveyed and assigned to Lender hereunder includes all rights, easements, rights of way, reservations and powers of Borrower, as owner, declarant or otherwise, under any applicable condominium act or statute and under any and all condominium declarations, survey maps and plans, association articles and bylaws and documents similar to any of the foregoing.

5.19 **Use of Property; Zoning Changes.** Unless required by applicable law or with Lender's *prior written approval,* to be given or withheld in Lender's sole and absolute discretion, Borrower shall not: (a) allow any material change in the use to which the Property is being put by Borrower as an owner-occupant of the Property; or (b) initiate or acquiesce in a change in the zoning classification of the Property.

5.20 **Publicity.** Borrower hereby grants permission to Lender and any subsequent holder of the Loan to issue press releases, advertisements and other promotional materials concerning the financing of the Property, which materials may *include the property name and description,* loan amount, major tenants, loan term and amortization and the identity of Borrower and any guarantors.

5.21 **Notice of Material Events.** Borrower shall give Lender prompt written notice of any and all (a) litigation, arbitration or administrative proceedings that Borrower or any Guarantor is a party to or that affect the Property, and (b) other matters that have or are reasonably likely to result in a material adverse change in the condition (financial or otherwise) of Borrower, any Guarantor or the Property. Immediately after becoming aware of the existence of any condition or event that constitutes a Default or Event of Default, Borrower shall give Lender written notice specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

5.22 **Books and Records.** Borrower shall maintain adequate books and records. Borrower shall permit any representative of Lender, at any reasonable time and from time to time, to inspect, audit and examine such books and records and make copies of same.

1117492/LA

-16-

5.23 **Hazardous Materials**. Borrower shall comply and cause the Property to comply with all federal, state and local laws, ordinances and regulations and all judgments, consent decrees, settlements or compromises relating to Hazardous Materials. Borrower shall immediately notify Lender in writing of any claims or actions pending or threatened against Borrower or the Property by any governmental entity or agency or any other person or entity relating to Hazardous Materials ("Hazardous Materials Claims").

5.24 **Property Management**. For so long as the Loan shall remain outstanding, the Property shall not be managed by any person other than the Manager, and Borrower shall not amend, modify, supplement or terminate the Management Agreement, enter into any other agreement providing for management of the Property, or designate any other person as property manager without Lender's prior written consent, to be given or withheld in Lender's sole and absolute discretion. Without limiting the foregoing, Lender may condition its consent to any management agreement upon the delivery of an assignment and subordination agreement with respect to such management agreement in form and substance acceptable to Lender.

6. **DEFAULT; REMEDIES**.

6.1 **Definition**. Any of the following shall constitute an "Event of Default" as that term is used in this Security Instrument (and the term "Default" shall mean any event that, with the passage of time or the giving of notice, would become an Event of Default):

6.1.1 any payment of principal and/or interest under the Note (including but not limited to any payment of principal or interest due on the Maturity Date, as defined in the Note) is not received by Lender on the date when due, or any other amount secured by this Security Instrument is not received by Lender within five (5) days after the date when due; or

6.1.2 any representation or warranty made by Borrower or any Guarantor to or for the benefit of Lender herein or elsewhere in connection with the Loan, including but not limited to any representation in connection with the security therefor, shall prove to have been incorrect or misleading in any material respect; or

6.1.3 Borrower, any Guarantor or any other party thereto (other than Lender) shall fail to perform its obligations under any other covenant or agreement contained in this Security Instrument, the Note, any other Loan Document or the Indemnity Agreement, which failure continues for a period of thirty (30) days after written notice of such failure by Lender to Borrower, but no such notice or cure period shall apply in the case of: (i) any such failure that could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Security Instrument, the other Loan Documents or the Indemnity Agreement, result in harm to Lender, impairment of the Note or this Security Instrument or any other security given under any other Loan Document; (ii) any such failure that is not reasonably susceptible of being cured during such 30-day period; (iii) breach of any provision that contains an express cure period; or (iv) any breach of Section 5.13 or Section 5.14 of this Security Instrument; or

6.1.4 Borrower, any Guarantor, or any other person or entity liable for the repayment of the indebtedness secured hereby shall become unable or admit in writing its inability to pay its debts as they become due, or file, or have filed against it, a voluntary or involuntary petition in bankruptcy, or make a general assignment for the benefit of creditors, or become the subject of any other receivership or insolvency proceeding, provided that if such petition or proceeding is not filed or acquiesced in by Borrower or the subject thereof, it shall constitute an Event of Default only if it is not dismissed within sixty (60) days after it is filed or if prior to that time the court enters an order substantially granting the relief sought therein; or

6.1.5 Borrower or any Guarantor shall default in the payment of any other indebtedness to Lender or an affiliate of Lender, or any other indebtedness for borrowed money in an

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 593 PAGE 19 OF 32

aggregate amount greater than $25,000, or if any such indebtedness shall be accelerated for any reason; *or*

      6.1.6   any Guarantor dies, becomes incapacitated, or attempts to revoke its guaranty; or

      6.1.7   this Security Instrument, the Note or any other Loan Document shall fail to remain in full force or effect, or any action shall be taken by Borrower, any Guarantor, or any other person to revoke, discontinue or assert the invalidity or unenforceability thereof; or

      6.1.8   any judgment for the payment of money is entered against Borrower or any Guarantor and not be satisfied or stayed pending appeal within thirty (30) days thereafter; or

      6.1.9   an attachment or garnishment writ or the like is issued or levied against all or any material portion of the Property and is not released, vacated or fully bonded within 30 calendar days after its issue or levy; or

      6.1.10  A tax, charge or lien shall be placed upon or measured by the Note, this Security Instrument, or any obligation secured hereby that Borrower does not or may not legally pay in addition to the payment of all principal and interest as provided in the Note.

      If an Event of Default exists, then such Event of Default will continue to exist until it either is cured (to the extent specifically permitted) in accordance with the Loan Documents, and Lender acknowledges such cure, or is otherwise expressly waived in writing by Lender.

      6.2   **Lender's Right to Perform**.  After the occurrence and during the continuance of any Event of Default, Lender, but without the obligation so to do and without notice to or demand upon Borrower and without releasing Borrower from any obligations hereunder, may: make any payments or do any acts required of Borrower hereunder in such manner and to such extent as either may deem necessary to protect the security hereof, Lender being authorized to enter upon the Property for such purposes; commence, appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Lender; pay, purchase, contest or compromise any encumbrance, charge or lien in accordance with the following paragraph; and in exercising any such powers, pay necessary expenses, employ counsel and pay a reasonable fee therefor. All sums so expended shall be payable on demand by Borrower, be secured hereby and bear interest at the Default Rate of interest specified in the Note from the date advanced or expended until repaid.

Lender, in making any payment herein, is hereby authorized, in the place and stead of Borrower, in the case of a payment of taxes, assessments, water rates, sewer rentals and other governmental or municipal charges, fines, impositions or liens asserted against the Property, to make such payment in reliance on any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of the bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof; in the case of any apparent or threatened adverse claim of title, lien, statement of lien, encumbrance, deed of trust, mortgage, claim or charge Lender, as the case may be, shall be the sole judge of the legality or validity of same; and in the case of a payment for any other purpose herein and hereby authorized, but not enumerated in this paragraph, such payment may be made whenever, in the sole judgment and discretion of Lender, as the case may be, such advance or advances shall seem necessary or desirable to protect the full security intended to be created by this Security Instrument, provided further, that in connection with any such advance, Lender at its option may and is hereby authorized to obtain a continuation report of title prepared by a title insurance company, the cost and expenses of which shall be repayable by Borrower without demand and shall be secured hereby.

      6.3   **Remedies on Default**.  Automatically upon the occurrence of any Event of Default under Section 6.1.4 above with respect to Borrower, and at the option of Lender in Lender's sole

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 594 PAGE 20 OF 32

and absolute discretion upon the occurrence of any other Event of Default, all sums secured hereby shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which Borrower hereby expressly waives, and Lender may:

6.3.1 Have a receiver appointed as a matter of right on an *ex parte* basis without notice to Borrower and without regard to the sufficiency of the Property or any other security for the indebtedness secured hereby and, without the necessity of posting any bond or other security. Such receiver shall take possession and control of the Property and shall *collect and receive the Rents. If* Lender elects to seek the appointment of a receiver for the Property, Borrower, by its execution of this *Security Instrument,* expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. The receiver shall be entitled to receive a reasonable fee for managing the Property, which fee may be deducted from the Rents or may be paid by Lender and added to the indebtedness secured by this Security Instrument. *Immediately upon appointment of a* receiver, Borrower shall surrender possession of the Property to the receiver and shall deliver to the *receiver all documents,* records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Property and all security deposits. If the Rents are not sufficient to pay the costs of taking control of and managing the Property and collecting the Rents, any funds expended by Lender, or advanced by Lender *to the receiver, for such purposes shall become an* additional part of the indebtedness secured by this Security Instrument. The receiver may exclude Borrower and its representatives from the Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this <u>Section 6.3</u> shall not be construed to make Lender a Lender-in-possession of the Property so long as Lender has not itself entered into actual possession of the *Property.*

6.3.2 Foreclose this Security Instrument pursuant to a judicial foreclosure proceeding or otherwise realize upon the Property.

6.3.3 Exercise *its power of sale.*

6.3.4 Sue on the Note as permitted under applicable law.

6.3.5 Avail itself of any other right or remedy available to it under the terms of this Security Instrument, the other *Loan Documents or applicable law.*

6.4 **Deemed Prepayment**. If at any time after an Event of Default and acceleration of the indebtedness secured hereby there shall be a tender of payment of the amount necessary to satisfy such indebtedness by or on behalf of Borrower, its successors or assigns, the same shall be deemed to be a voluntary prepayment *such that the sum required to satisfy such indebtedness in full shall* include, to the extent permitted by law, the additional payment required under the prepayment terms of the Note.

6.5 **No Waiver**. By accepting payment of any sum secured hereby after its due date, Lender does not waive *its right either to require prompt payment when due of all other sums so secured* or to declare an Event of Default for failure to do so.

6.6 **Waiver of Marshaling, Etc**. In connection with any foreclosure sale under this Security Instrument, Borrower hereby waives, for itself and all others claiming by, through or under Borrower, any right Borrower or such others would otherwise have to require marshaling or to require that the Property be sold in parcels or in any particular order.

6.7 **Remedies Cumulative; Subrogation**. The rights and remedies accorded by this Security Instrument shall be in addition to, and not in substitution of, any rights or remedies available under now existing *or hereafter arising applicable law.* All rights and remedies provided for in this Security Instrument or afforded by law or equity are distinct and cumulative and may be exercised concurrently, independently or successively. The failure on the part of Lender to promptly enforce any

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 595 PAGE 21 OF 32

right hereunder shall not operate as a waiver of such right and the waiver of any Default or Event of Default shall not constitute a waiver of any subsequent or other Default or Event of Default. Lender shall be subrogated to the claims and liens of those whose claims or liens are discharged or paid with the proceeds of the Loan or the Property.

7.       Intentionally omitted.

8.       INDEMNITY. Borrower shall defend, indemnify and hold harmless Lender (including, without limitation, any purchaser or assignee of or participant in the Loan), any entity controlling, controlled by, or under common control with Lender, the directors, officers, employees and agents of Lender and such other entities, and the heirs, successors and assigns of each of the foregoing persons (each an "Indemnified Party" and together the "Indemnified Parties") from and against any claim, loss, damage, cost, expense or liability directly or indirectly arising out of:  (a) any failure of Borrower to perform Borrower's obligations under the Loan Documents; (b) any inaccuracy in any representation or warranty of Borrower under the Loan Documents; (c) any alleged obligation on the part of any Indemnified Party to pay or perform any obligations contained in any other document related to the Property (other than this Security Instrument); or (d) any act or omission by Borrower or any contractor, agent, employee or representative of Borrower with respect to the Property. The foregoing to the contrary notwithstanding, this indemnity shall not include any claim, loss, damage, cost, expense or liability directly or indirectly arising out of the gross negligence or willful misconduct of any Indemnified Party.  Borrower shall pay immediately upon Lender's demand any amounts owing under this indemnity together with interest from the date the indebtedness arises until paid at the rate of interest applicable to the principal balance of the Note as specified therein. Borrower agrees to use legal counsel reasonably acceptable to the applicable Indemnified Parties in any action or proceeding arising under this indemnity.  THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION AND/OR RECONVEYANCE OR RELEASE AND/OR DISCHARGE OF THIS SECURITY INSTRUMENT.

9.       FIXTURE FILING. This Security Instrument constitutes a financing statement, filed as a fixture filing in the real estate records of the county of the state in which the real property described in Exhibit A is located, with respect to any and all fixtures included within the list of improvements and fixtures described in Section 1.2 of this Security Instrument and to any goods or other personal property that are now or hereafter will become a part of the Property as fixtures.

10.     MISCELLANEOUS.

10.1      Notices. Any notice to or demand upon Borrower (including any notice of default or notice of sale) or Lender shall be deemed to have been sufficiently made for all purposes when deposited in the United States mails, postage prepaid, registered or certified, return receipt requested, addressed to Borrower or Lender, as applicable, at its respective address set forth in the first paragraph after the title of this Security Instrument, or to such other address as the recipient may have directed by notice in accordance herewith. The giving of notice may be waived in writing by the person or persons entitled to receive such notice, either before or after the time established for the giving of such notice.

10.2      Modifications, Etc. Each person or entity now or hereafter owning any interest in the Property agrees, by executing this Security Instrument or taking the Property subject to it, that Lender may in its sole discretion and without notice to or consent of any such person or entity: (a) extend the time for payment of the obligations secured hereby; (b) discharge or release any one or more parties from their liability for such obligations in whole or in part; (c) delay any action to collect on such obligations or to realize on any collateral therefor; (d) release or fail to perfect any security for such obligations; (e) consent to one or more transfers of the Property, in whole or in part, on any terms; (f) waive or release any of holder's rights under any of the Loan Documents; (g) agree to an increase in the amount of such obligations or to any other modification of such obligations or of the Loan Documents; or (h) proceed against such person or entity before, at the same time as, or after it proceeds against any other person or entity liable for such obligations.

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 596 PAGE 22 OF 32

**10.3   Successors and Assigns**.  All provisions herein contained shall be binding upon and inure to the benefit of the respective successors and assigns of the parties.

**10.4   Governing Law; Severability**.  This Security Instrument shall be governed by the law of the State of New Jersey, without regard to its conflicts of law provisions.  In the event that any provision or clause of this Security Instrument, the Note or any other Loan Document conflicts with applicable law, the conflict shall not affect other provisions of this Security Instrument, the Note or such other Loan Document that can be given effect without the conflicting provision and to this end the provisions of this Security Instrument, the Note and the other Loan Documents are declared to be severable.

**10.5   Attorneys' Fees and Legal Expenses**.  In the event of any Default under this Security Instrument, or in the event that any dispute arises relating to the interpretation, enforcement or performance of any obligation secured by this Security Instrument, Lender shall be entitled to collect from Borrower on demand all fees and expenses incurred in connection therewith, including but not limited to fees of attorneys, accountants, appraisers, environmental inspectors, consultants, expert witnesses, arbitrators, mediators and court reporters.  Without limiting the generality of the foregoing, Borrower shall pay all such costs and expenses incurred in connection with: (a) arbitration or other alternative dispute resolution proceedings, trial court actions and appeals; (b) bankruptcy or other insolvency proceedings of Borrower, any guarantor or other party liable for any of the obligations secured by this Security Instrument or any party having any interest in any security for any of those obligations; (c) judicial or nonjudicial foreclosure on, or appointment of a receiver for, any of the Property; (d) post-judgment collection proceedings; (e) all claims, counterclaims, cross-claims and defenses asserted in any of the foregoing whether or not they arise out of or are related to this Security Instrument; (f) all preparation for any of the foregoing; and (g) all settlement negotiations with respect to any of the foregoing.

**10.6   Time is of the Essence**.  Time is of the essence under this Security Instrument and in the performance of every term, covenant and obligation contained herein.

**10.7   Interpretation; Headings; Final Agreement**.  Whenever the context so requires the singular number includes the plural herein, and the impersonal includes the personal.  The headings to the various sections have been inserted for convenient reference only and shall not modify, define, limit or expand the express provisions of this Security Instrument.  This Security Instrument, the Note and the other Loan Documents constitute the final expression of the entire agreement of the parties with respect to the transactions set forth therein.  No party is relying upon any oral agreement or other understanding not expressly set forth in the Loan Documents.  The Loan Documents may not be amended or modified except by means of a written document executed by the party sought to be charged with such amendment or modification.

**10.8   No Third Party Beneficiaries**.  No creditor of any party to this Security Instrument and no other person or entity shall be a third party beneficiary of this Security Instrument or any other Loan Document.  Without limiting the generality of the preceding sentence, (a) any arrangement (a "Servicing Arrangement") between Lender and any servicer of the Loan for loss sharing or interim advancement of funds shall constitute a contractual obligation of such servicer that is independent of the obligation of Borrower for the payment of the indebtedness secured hereby, (b) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (c) no payment by a servicer under any Servicing Arrangement will reduce the amount of the indebtedness secured hereby.

**10.9   Submission to Jurisdiction**.  Borrower irrevocably submits to the nonexclusive jurisdiction of any federal or state court sitting in Middlesex County, New Jersey, over any suit, action or proceeding arising out of or relating to this Security Instrument, the Note, any other Loan Document or the Property.  Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.  Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 597 PAGE 23 OF 32

requested, to Borrower's address shown on the first page of this Security Instrument or as notified to Lender and (ii) by serving the same upon Borrower(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

10.10   **WAIVER OF JURY TRIAL.**  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (FOR ITSELF AND ITS SUCCESSORS, ASSIGNS AND PARTICIPANTS) WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS SECURITY INSTRUMENT, THE OTHER **LOAN DOCUMENTS OR THE TRANSACTIONS PROVIDED FOR HEREIN OR THEREIN, IN ANY LEGAL ACTION OR PROCEEDING OF ANY TYPE BROUGHT BY ANY PARTY TO ANY OF THE FOREGOING AGAINST ANY OTHER SUCH PARTY, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT SITTING WITHOUT A JURY.**

10.11   **Release.**  Upon indefeasible repayment in full of all sums owing and outstanding under the Loan Documents and full satisfaction of all other obligations under the Loan Documents, Lender shall terminate and release the lien of this Security Instrument, without warranty.

10.12   **Waiver of Right of Offset.**  No portion of the indebtedness secured by this Security Instrument shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Lender.

**11.   NEW JERSEY STATE PROVISIONS.**

11.1   **Principles of Construction.**  In the event of any inconsistencies between the terms and conditions of this Section 11 and the other terms and conditions of this Security Instrument, the terms and conditions of this Section 11 shall control and be binding.

11.2   **Non-Residential Property.**  This Security Instrument does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate six (6) residential dwelling units or less, each unit having its own separate cooking facilities, nor by a one to six family residence occupied by the owner, nor consisting of any property owned by a cooperative apartment corporation.

11.3   **Certain Waivers.**  Borrower hereby waives and releases all benefit that might accrue to Borrower by virtue of any present or future law exempting the Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any stay of execution, exemption from civil process or extension of time for payment, or any right of marshalling in the event of any sale hereunder of the Property, and, unless specifically required herein, all notices of Borrower's default or of Lender's election to exercise, or Lender's actual exercise of any option under this Security Instrument or any other Loan Documents.  Borrower waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Borrower, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action or any other action to exercise its remedies hereunder or otherwise available at a law or in equity.

11.4   **Maximum Secured Amount.**  The maximum amount of the obligations secured hereby is as follows:  (a) the principal amount of up to **Four Hundred Seventy-Two Thousand Five Hundred** and 00/100 Dollars (**$472,500.00**), plus (b) interest, fees, costs and expenses (including attorneys' fees and expenses), other charges and fees for which Borrower is obligated to Lender pursuant to this Security Instrument, the Note or otherwise, plus (c) any advances made by Lender to protect or preserve the Property, any part thereof or the interests of Lender therein (including, but not limited to, (i) the reasonable expenses of any litigation to prosecute or defend the rights and lien created by this Security Instrument and (ii) any amount, cost or charges to, which the Security Instrument becomes

1117492/LA                                                    -22-

subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority) or any advances made for payment of taxes, charges or assessments in connection with any or all of the Property, or premiums on insurance with respect to any or all of the Property. The foregoing limitation on the obligations secured hereby shall not, in any manner, limit the amount of any obligations, liabilities or indebtedness secured by any of the other Loan Documents or other collateral granted thereunder, nor affect the priority thereof.

11.5 **Enforceability; Usury**. In no event shall any provision of this Security Instrument or any other Loan Document ever obligate Borrower to pay or allow Lender to collect interest on the obligations or any other indebtedness secured hereby at a rate greater than the maximum non-usurious rate permitted by applicable law (herein referred to as the **"Highest Lawful Rate"**), or obligate Borrower to pay any taxes, assessments, charges, insurance premiums or other amounts to the extent that such payments, when added to the interest on the obligations or any other indebtedness secured hereby, would be held to constitute the payment by Borrower of interest at a rate greater than the Highest Lawful Rate; and this provision shall control over any provision to the contrary. Notwithstanding the foregoing, in the event Borrower shall pay or Lender shall receive any interest at a rate greater than the Highest Lawful Rate (the **"Excess Amount"**), the entire Excess Amount automatically shall be deemed to be a payment on account of, and shall be credited against and reduce, the principal amount of the obligations secured hereby.

11.6 **Future Advances**. This Security Instrument is given for the purpose of creating a lien on real property in order to secure not only existing indebtedness, but also future advances, whether such advances are obligatory or to be made at the option of Lender, or otherwise, and whether made before or after default or maturity or other similar events, to the same extent as if such future advances were made on the date of the execution hereof, although there may be no advance made at the time of the execution hereof and although there may be no indebtedness outstanding at the time any advance is made. The types of future advances secured by and having priority under this Security Instrument shall include, without limitation, (i) advances and readvances of principal under the Note or other Loan Documents and (ii) disbursements and other advances for the payment of taxes, assessments, maintenance charges, insurance premiums or costs relating to the Property, for the discharge of liens having priority over the lien of this Security Instrument, for the curing of waste of the Property and for the payment of service charges and expenses incurred by reason of default and including late charges, attorney's fees and court costs, together with interest thereon. The lien of this Security Instrument, as to third persons with or without actual knowledge thereof, shall be valid as to all such indebtedness and future advances, from the date of recordation, to the extent permitted by the laws of the state in which the Property is situated. The total amount of the indebtedness secured by this Security Instrument may decrease or increase from time to time, but the total unpaid principal balance at any one time shall not exceed the maximum principal amount of the Obligations.

11.7 **Loan Subject to Modification**. This Security Instrument secures a loan which by its terms is subject to modification as defined under P.L. 1986 c. 353 (N.J.S.A. 46:9-8.1. et seq.) and shall be subject to the priority provisions thereof and the priority of the lien of this Security Instrument with respect to any and all modification (as so defined) shall relate back to and remain as it was at the time of recording of this Security Instrument (with the same effect as if such modifications were originally included in this Security Instrument or as if the modification occurred at the time of the recording of this Security Instrument). This shall include, but not be limited to, subsequent advances of principal pursuant to the Loan Documents.

11.8 **True and Complete Copy**. BORROWER ACKNOWLEDGES THAT BORROWER HAS RECEIVED, WITHOUT CHARGE, A TRUE AND CORRECT COPY OF THIS SECURITY INSTRUMENT.

11.9 **Continuing Enforcement of Mortgage**. If, after receipt of any payment of all or any part of the Loan, Lender is compelled under the Loan Documents or pursuant to a judgment to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance or a

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 599 PAGE 25 OF 32

diversion of trust funds), then this Security Instrument and the other Loan Documents shall continue in full force and effect, and Borrower shall be liable for, and shall indemnify, defend and hold harmless Lender with respect to the full amount so surrendered. The provisions of this Section 11.9 shall survive the cancellation or discharge of this Security Instrument and shall remain effective notwithstanding the payment of the Loan, the cancellation of the Note, the release of any security interest, lien or encumbrance securing the Loan or any other action which Lender may have taken in reliance upon its receipt of such payment. Any cancellation, release or other such action by Lender shall be deemed to have been conditioned upon any payment of the Loan having become final and irrevocable.

        11.10   **No Merger**. There shall be no merger of the interest or estate created by this Security Instrument with any other interest or estate in the Property at any time held by or for the benefit of Lender or any subsidiary or affiliate in any capacity, without the express prior written consent of Lender and the rights of Lender set forth herein and in the Loan Documents shall, to the extent not prohibited by law, extend also to the period from and after the filing of any suit to foreclose the lien of this Security Instrument, the entry of judgment and any subsequent period including any period allowed by law for the redemption of the Property after any foreclosure sale.

        11.11   **Waiver of Jury Trial**. *Section 10.10 is hereby amended by adding the following paragraph at the end of that section:* **IN ADDITION, BORROWER (OR ANY ONE OF THEM, IF MORE THAN ONE) HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS SECURITY INSTRUMENT, THE DEBT, THE OBLIGATIONS, THE LOAN AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY BORROWER OR LENDER OR WHICH IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN BORROWER AND LENDER. THIS WAIVER OF A RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS** *INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.* **LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.**

        11.12   **ISRA Filings in New Jersey**.    In the event that Lender seeks to take possession of the Property in New Jersey or in any other instance in which compliance is required, Borrower, at its sole cost and expense, shall address the potential requirements of the Industrial Site Recovery Act, N.J.S.A. §13:1K-6 et seq., as amended ("ISRA") and all related regulations promulgated by the New Jersey Department of Environmental Protection ("NJDEP"). *In the event ISRA compliance is triggered by any action of Borrower including, but not limited to Borrower's surrendering possession of the Property to Lender,* Borrower shall be responsible, at its sole cost and expense, for complying with the terms and requirements of ISRA. Lender, however, shall cooperate with Borrower in its ISRA compliance activities, including but not limited to (i) providing Borrower and its agents with access to the Real Property where reasonably necessary to satisfy ISRA or NJDEP requirements, including, by way of example and not limitation, access for the purposes of inspecting the Real Property or for obtaining soil, water, groundwater or other samples, (ii) providing documents within its sole possession, and (iii) executing documents needed for submission to the NJDEP or others.

        11.13   **Site Remediation Reform Act**.   Notwithstanding anything to the contrary contained herein, Borrower shall comply with the requirements of the Site Remediation Reform Act (S.1897/A.2962) ("SRRA") and in the event ISRA compliance is required, Borrower shall, at its sole cost and expense, retain the services of a Licensed Site Remediation Profession (as defined in the SRRA) ("LSRP") and shall perform all actions necessary or useful to cause the LSRP to issue an unconditional Response Action Outcome (as defined in the SRRA).

        11.14   **Interest Rate Not Reduced on Judgment**.   In the event Lender obtains any judgment against Borrower on this Security Instrument, the Note, the Loan Agreement or on the other Loan Documents, whether such judgment is obtained by confession or otherwise, interest shall accrue on the judgment in the same manner and at the same rate as provided in the Note, notwithstanding any law,

1117492/LA

-24-

custom or legal presumption to the contrary, subject only to the usury savings clauses of the *Note and this Security Instrument*, until Lender has received payment in full of all amounts due pursuant to this Security Instrument, the Note, and the other Loan Documents secured hereby.

      11.15   **No Construction against Drafting Party**.  Borrower and Lender have been represented by independent counsel of their own selection in connection with the negotiation, execution and delivery of this Security Instrument and the other documents, instruments, records and papers relating hereto, and, without waiving the attorney-client privilege and expressly preserving the same, Borrower and Lender acknowledge that they have made such comments on this Security Instrument and the other documents, instruments, records and papers relating hereto as they have deemed necessary under the circumstances.  Borrower and Lender intend that this *Security Instrument and the other* documents, instruments, records and papers relating hereto, shall not be construed against one party or the other based upon any rule of any applicable law giving preference in interpretation to the drafting or non-drafting party or its counsel.

*[Remainder of this page intentionally left blank]*

CFN 2018079967 O DOC_TYPE MG BK 17293 PG 601 PAGE 27 OF 32

DATED as of the day and year first above written.

**BORROWER:**

**AMBOY LP VENTURES LLC,**
a New Jersey limited liability company

By: _____

Name: Seth Levine

Title:  Sole Member

Signature Page to Mortgage

**ACKNOWLEDGMENT**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

ACKNOWLEDGMENT

STATE OF NEW JERSEY )
                   : SS:
COUNTY OF _Bergen_ )

    On the _7th_ day of _September_, before me personally came Seth Levine, to me known to be the person who executed the foregoing instrument, and who, being by me duly sworn, did depose and say that he/she is the Sole Member of AMBOY LP VENTURES LLC, a New Jersey limited liability company and that he/she executed the foregoing instrument in the name of said company, and that he/she had authority to sign the same, and acknowledge that he/she executed the same as the act and deed of said limited liability company.

                  _____
                  (Notary)

**ANDREW SELEVAN**
**NOTARY PUBLIC OF NEW JERSEY**
**My Commission Expires 1/25/2021**

Acknowledgment to Mortgage

1117492/LA

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

All that certain lot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the City of Perth Amboy, County of Middlesex, State of New Jersey.

BEING known and designated as part of Lot 28 as shown on a certain map entitled "Map of Property of Mrs. Kate P. Bertrand, at Perth Amboy, NJ", dated August 29, 1904 which map was filed in the Middlesex County Clerk's Office on September 6, 1904 as Map No. 391 File No. 391.

BEGINNING at a point marked by a cross cut found in concrete in the Northwesterly line of Bertrand Avenue (50.00 foot R.O.W.), and said point being distant 25.00 feet measured Northwesterly and at right angles to the centerline thereof, said point being located a distance of 113.30 feet Southwesterly from the intersection of the Southwesterly line of Smith Street (66.00 foot R.O.W.) with the aforesaid Northwesterly line of Bertrand Avenue, said point also being in the Southwesterly line of Lot 26 Block 74 as shown on the Tax Map; thence

1. South 20 degrees 00 minutes 00 seconds West, 25.00 feet along the aforesaid Northwesterly line of Bertrand Avenue to a point being in the Northeasterly line of Lot 21 Block 74 as shown on the aforesaid Tax Map; thence

2. North 70 degrees 00 minutes 00 seconds West, 91.81 feet along the aforesaid Northeasterly line of Lot 24 in Block 74 to a point in the Southeasterly line of Lot 25.01 in Block 74 as shown on the aforesaid Tax Map; thence

3. North 19 degrees 38 minutes 00 seconds East, 25.00 feet along the aforesaid Southeasterly line of Lot 25.02 in Block 74 to a point in the Southwesterly line of Lot 29 Block 74 as shown on the aforesaid Tax Map; thence

4. South 70 degrees 00 minutes 00 seconds East, 91.97 feet along the aforesaid Southwesterly line of Lot 29 Block 74 and beyond, along the Southwesterly line of Lot 28 Block 74 and beyond, along the Southwesterly line of Lot 27, Block 74 and beyond, along the aforesaid Southwesterly line of Lot 26 Block 74 as shown on the aforesaid Tax Map to a point marked by the cross cut found in concrete in the aforesaid Northwesterly line of Bertrand Avenue, said point being the point of BEGINNING

**EXHIBIT "A"**
-1-

## ADDENDUM TO SECURITY INSTRUMENT
## (CROSS-COLLATERALIZATION)

This Addendum to Security Instrument (Cross-Collateralization) (this "Addendum") is dated as of September 7, 2018, and is made by the undersigned as borrower ("Borrower"), in favor of Nexus Capital Investments, LLC, a New York limited liability company, as lender (together with its successors and assigns, "Lender"). This Addendum is attached to and made a part of the *Mortgage*, Security Agreement, *Assignment of Leases and Rents and Fixture Filing* dated on or about the date hereof (as amended, modified, supplemented, extended, restated or replaced from time to time, the "Security Instrument") made by Borrower in favor of Lender and encumbering certain real property commonly known as 285 Bertrand Avenue, Perth Amboy, New Jersey 08861, as further described therein (the "Property"), and the terms set forth herein shall have the same force and effect as if fully set forth in the Security Instrument. If there is a conflict between a term of this Addendum and a term of the Security Instrument, the applicable term of this Addendum shall control, but only to the extent necessary to remove such conflict. Capitalized terms used but not defined herein shall have the meanings given in the Security Instrument.

1. **CROSS-COLLATERALIZATION**. Section 6 of the Security Instrument is hereby amended to add the following as Section 6.8 thereof:

6.8 **Remedies Against Other Collateral**. Borrower hereby acknowledges that Borrower's obligations to Lender are also secured by liens on collateral that may be located in jurisdictions other than the jurisdiction where the Property is located. Borrower further agrees and consents that while an Event of Default exists Lender shall have the right, in its sole and absolute discretion, to exercise any and all rights and remedies in and under any of the Loan Documents, including the right to proceed, at the same or at different times, to foreclose any or all liens against such collateral (or sell such collateral under power of sale) in accordance with the terms of the Loan Documents, by any proceedings appropriate in the jurisdictions where such collateral is located, and that no enforcement action taking place in any jurisdiction shall preclude or bar enforcement in any other jurisdiction. Any exercise by Lender of its remedies under any Loan Document in any jurisdiction in which collateral for Borrower's obligations to Lender is located may be brought and prosecuted as to any part of such collateral without regard to the fact that such exercise of remedies has not been instituted elsewhere on any other part of the collateral for Borrower's obligations to Lender. No notice, except as may be expressly required by the Loan Documents or by applicable law, shall be required to be given to Borrower in connection with Lender's exercise of any and all of its rights or remedies as described above.

*[Signature Page Follows]*

1114514/LA                                        -1-

IN WITNESS WHEREOF, Borrower has executed this Addendum as of the date first above written.

**Borrower:**

AMBOY LP VENTURES LLC,
a New Jersey limited liability company

By: _____

Name: Seth Levine

Title: Sole Member

Signature Page to Addendum to Security Instrument (Cross-Collateralization)

1114514/LA

**EXHIBIT "D"**

| Hudson County Recording Data Page<br>Diane Coleman<br>Hudson County Register | Official Use Only - Barcode |
|---|---|

Official Use Only - Realty Transfer Fee

Hudson County Register 20180911060114000 Bk: 19244
Pg: 494 1/31
09/11/2018 11:48:36 AM MORTGAGES
Diane Coleman
Hudson County, Register of Deeds
Receipt No. 1438186

| Date of Document:<br>2018-09-07 | Type of Document:<br>MORTGAGES |
|---|---|
| First Party Name:<br>NORTH BERGEN VENTURES, LLC | Second Party Name:<br>NEXUS CAPITAL INVESTMENTS, LLC |

Additional Parties:

---

**THE FOLLOWING SECTION IS REQUIRED FOR DEEDS ONLY**

| Block: | Lot: |
|---|---|

Municipality:
North Bergen

Consideration:

Mailing Address of Grantee:

**THE FOLLOWING SECTION IS FOR ORIGINAL MORTGAGE BOOKING & PAGING INFORMATION FOR ASSIGNMENTS, RELEASES, SATISFACTIONS, DISCHARGES & OTHER ORIGINAL MORTGAGE AGREEMENTS ONLY**

| Original Book: | Original Page: |
|---|---|

**HUDSON COUNTY RECORDING DATA PAGE**
Please do not detach this page from the original document as it contains important recording information and is part of the permanent record.

**DISCLAIMER**
A recording officer shall not be liable for differences between the cover sheet or the electronic synopsis and the document. If descrepencies are found, the entire document will be rejected.

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Koss & Schonfeld, LLP
90 John Street, Suite 503
New York, New York 10038
Attn: Simcha D. Schonfeld, Esq.

Loan No.: 507
LT-1618-NJ

*THIS SPACE FOR RECORDER'S USE ONLY*

ATTENTION: COUNTY CLERK THIS SECURITY INSTRUMENT IS A SECURITY AGREEMENT AND FINANCING STATEMENT UNDER THE NEW JERSEY UNIFORM COMMERCIAL CODE. PORTIONS OF THE PROPERTY ARE GOODS WHICH ARE OR ARE TO BECOME AFFIXED TO OR FIXTURES ON THE LAND. THIS SECURITY INSTRUMENT IS, THEREFORE, TO BE FILED FOR RECORD OR RECORDED AS A FIXTURE FILING IN, AMONG OTHER PLACES, THE REAL ESTATE RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED. THE MORTGAGOR/BORROWER IS THE OWNER OF A RECORD INTEREST IN THE REAL ESTATE CONCERNED. THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS.

*[DRAFTING NOTE: THIS MORTGAGE IS ONLY FOR USE FOR MULTIFAMILY PROPERTIES CONTAINING SIX (6) OR MORE RESIDENTIAL UNITS]*

MORTGAGE, SECURITY AGREEMENT,
ASSIGNMENT OF LEASES AND RENTS
AND FIXTURE FILING

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this "Security Instrument"), is made this 7th day of September, 2018 by NORTH BERGEN VENTURES LLC, a New Jersey limited liability company, the address of which is 210 River Street, Suite 24, Hackensack, New Jersey, 07601, as Borrower ("Borrower"), to Nexus Capital Investments, LLC, a New York limited liability company, the address of which is 2233 Nostrand Ave, 3rd Floor, Brooklyn, New York 11210, together with its successors and/or assign, as Lender ("Lender").

    **1.**    GRANTING CLAUSE. Borrower, in consideration of the acceptance by Lender, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the obligations described in Section 3 below, irrevocably grants, bargains, sells, assigns and conveys to Lender and its successors and assigns, forever, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, all of Borrower's estate, right, title, interest, claim and demand in and to the property in the County of Hudson, State of New Jersey, with a street address of 1114 7th Street, North Bergen, New Jersey 07047 (which address is provided for reference only and shall in no way limit the description of the real and personal property otherwise described in this Section 1), described as follows, whether now existing or hereafter acquired (all of the property described in all parts of this Section 1 and all additional property, if any, described in Section 2 is called the "Property"):

    **1.1**    **Land and Appurtenances.** The land described on Exhibit A hereto, and all tenements, hereditaments, rights-of-way, easements, appendages and appurtenances thereto belonging or in any way appertaining, including without limitation all of the right, title and interest of Borrower in and to any avenues, streets, ways, alleys, vaults, strips or gores of land adjoining that property, all rights to water, water stock, drains, drainage and air rights relating to that property, and all claims or demands of Borrower either in law or in equity in possession or expectancy of, in and to that property; and

1117492/LA

1.2 **Improvements and Fixtures**. All buildings, structures and other improvements now or hereafter erected on the land described in Section 1.1 above, and all facilities, fixtures, machinery, apparatus, installations, goods, equipment, inventory, furniture, building materials and supplies and other properties of whatsoever nature, now or hereafter located in or used or procured for use in connection with that property, it being the intention of the parties that all property of the character described above that is now owned or hereafter acquired by Borrower and that is affixed or attached to, stored upon or used in connection with the land described in Section 1.1 above shall be, remain or become a portion of that property and shall be covered by and subject to the lien of this Security Instrument, together with all contracts, agreements, permits, plans, specifications, drawings, surveys, engineering reports and other work products relating to the construction of the existing or any future improvements on the Property, any and all rights of Borrower in, to or under any architect's contracts or construction contracts relating to the construction of the existing or any future improvements on the Property, and any performance and/or payment bonds issued in connection therewith, together with all trademarks, trade names, copyrights, computer software and other intellectual property used by Borrower in connection with the Property; and

1.3 **Enforcement and Collection**. Any and all rights of Borrower without limitation to make claim for, collect, receive and receipt for any and all rents, income, revenues, issues, earnest money, deposits, refunds (including but not limited to refunds from taxing authorities, utilities and insurers), royalties, and profits, including mineral, oil and gas rights and profits, insurance proceeds of any kind (whether or not Lender requires such insurance and whether or not Lender is named as an additional insured or loss payee of such insurance), condemnation awards and other moneys, payable or receivable from or on account of any of the Property, including interest thereon, or to enforce all other provisions of any other agreement (including those described in Section 1.2 above) affecting or relating to any of the Property, to bring any suit in equity, action at law or other proceeding for the collection of such moneys or for the specific or other enforcement of any such agreement, award or judgment, in the name of Borrower or otherwise, and to do any and all things that Borrower is or may be or become entitled to do with respect thereto, provided, however, that no obligation of Borrower under the provisions of any such agreements, awards or judgments shall be impaired or diminished by virtue hereof, nor shall any such obligation be imposed upon Lender; and

1.4 **Accounts and Income**. Any and all rights of Borrower in any and all accounts, rights to payment, contract rights, chattel paper, documents, instruments, licenses, contracts, agreements and general intangibles relating to any of the Property, including, without limitation, rent from any leases and any other income and profits derived from the operation of any business on the Property or attributable to services that occur or are provided on the Property or generated from the use and operation of the Property; and

1.5 **Leases**. All of Borrower's rights as landlord in and to all existing and future leases and tenancies, whether written or oral and whether for a definite term of month to month or otherwise, now or hereafter demising all or any portion of the property described in Sections 1.1 and 1.2 above, including all renewals and extensions thereof and all rents, deposits and other amounts received or receivable thereunder, and including all guaranties, supporting obligations, letters of credit (whether tangible or electronic) and letter of credit rights guaranteeing or supporting any such lease or tenancy (in accepting this Security Instrument Lender does not assume any liability for the performance of any such lease); and

1.6 **Books and Records**. All books and records of Borrower relating to the foregoing in any form.

2. SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS.

2.1 **Security Agreement**. To the extent any of the property described in Section 1 is personal property, Borrower, as debtor, grants to Lender, as secured party, a security interest therein together with a security interest in all other personal property of whatsoever nature that is located on or used or to be used in connection with any of the property described in Section 1, and any products or proceeds of any thereof, pursuant to the Uniform Commercial Code of the State of New Jersey (the

"UCC"), on the terms and conditions contained herein. Borrower hereby authorizes Lender to file any financing statement, fixture filing or similar filing to perfect the security interests granted in this Security Instrument without Borrower's signature.

2.2     **Assignment of Leases and Rents**.

2.2.1     **Absolute Assignment**.  Borrower hereby absolutely and unconditionally grants, transfers, conveys, sells, sets over and assigns to Lender all of Borrower's right, title and interest now existing and hereafter arising in and to the leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements, either oral or written, now existing and hereafter arising which affect the Property, Borrower's interest therein or any improvements located thereon, together with any and all security deposits, guaranties of the lessees' or tenants' obligations (including any and all security therefor), and other security under any such leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements, and all supporting obligations, letters of credit (whether tangible or electronic) and letter of credit rights guaranteeing or supporting any of the foregoing (all of the foregoing, and any and all extensions, modifications and renewals thereof, shall be referred to, collectively, as the "**Leases**") and all the income, rents, issues, profits, royalties and proceeds from the Leases and any business conducted on the Property and any and all prepaid rent and security deposits thereunder (collectively, the "**Rents**"). Borrower hereby gives to and confers upon Lender the right to collect all Rents .  The term "Rents" includes, but is not limited to all minimum-rents, additional rents, percentage rents, deficiency rents, common area maintenance charges, lease-termination payments, purchase option payments, refunds of any type, prepayment of rents, settlements of litigation, settlements of past due rents, and liquidated damages following default, and all proceeds payable under any policy of insurance covering loss of rents, together with any and all rights and claims of any kind that Borrower may have against any tenant under the Leases or any other occupant of the Property.  This Security Instrument is intended by Lender and Borrower to create and shall be construed to create a present absolute assignment to Lender of all of Borrower's right, title and interest in and to the Leases and the Rents and shall not be deemed merely to create a security interest therein for the payment of any indebtedness or the performance of any obligations under the Loan Documents (as defined below).  Borrower irrevocably appoints Lender its true and lawful attorney at the option of Lender at any time to demand, receive and enforce payment, to give receipts, releases and satisfactions and to sue, either in the name of Borrower or in the name of Lender, for all such Rents and apply the same to the obligations secured by this Security Instrument.

2.2.2     **Revocable License to Collect**.     Notwithstanding the foregoing assignment of Rents, so long as no Event of Default (as defined below) remains uncured, Borrower shall have a revocable license, to collect all Rents, and to retain the same.  Upon any Event of Default, Borrower's license to collect and retain Rents shall terminate automatically and without the necessity for any notice.

2.2.3     **Collection and Application of Rents by Lender**.  While any Event of Default remains uncured:  (i) Lender may at any time, without notice, in person, by agent or by court-appointed receiver, and without regard to the adequacy of any security for the obligations secured by this Security Instrument, enter upon any portion of the Property and/or, with or without taking possession thereof, in its own name sue for or otherwise collect Rents (including past due amounts); and (ii) without demand by Lender therefor, Borrower shall promptly deliver to Lender all prepaid rents, deposits relating to Leases or Rents, and all other Rents then held by or thereafter collected by Borrower, whether prior to or during the continuance of any Event of Default.  Any Rents collected by or delivered to Lender may be applied by Lender against the obligations secured by this Security Instrument, less all expenses, including attorneys' fees and disbursements, in such order as Lender shall determine in its sole and absolute discretion.  No application of Rents against any obligation secured by this Security Instrument or other action taken by Lender under this Section 2.2 shall be deemed or construed to cure or waive any Event of Default, or to invalidate any other action taken in response to such Event of Default, or to make Lender a Lender-in-possession of the Property.

2.2.4 **Direction to Tenants**. Borrower hereby irrevocably authorizes and directs the tenants under all Leases to pay all amounts owing to Borrower thereunder to Lender following receipt of any written notice from Lender that states that an Event of Default remains uncured and that all such amounts are to be paid to Lender. Borrower further authorizes and directs all such tenants to pay all such amounts to Lender without any right or obligation to inquire as to the validity of Lender's notice and regardless of the fact that Borrower has notified any such tenants that Lender's notice is invalid or has directed any such tenants not to pay such amounts to Lender.

**3.** **OBLIGATIONS SECURED**. This Security Instrument is given for the purpose of securing:

3.1 **Performance and Payment**. The performance of the obligations contained herein and the payment of $675,000.00 with interest thereon and all other amounts payable according to the terms of a promissory note of even date herewith made by Borrower, payable to Lender or order, and any and all extensions, renewals, modifications or replacements thereof, whether the same be in greater or lesser amounts (the "Note"), which Note may provide for one or more of the following: (a) a variable rate of interest; (b) a balloon payment at maturity; or (c) deferral of a portion of accrued interest under certain circumstances with interest so deferred added to the unpaid principal balance of the Note and secured hereby.

3.2 **Future Advances**. The repayment of any and all sums advanced or expenditures made by Lender subsequent to the execution of this Security Instrument for the maintenance or preservation of the Property or advanced or expended by Lender pursuant to any provision of this Security Instrument subsequent to its execution, together with interest thereon.

3.3 **Other Amounts.** All other obligations and amounts now or hereafter owing by Borrower to Lender under this Security Instrument, the Note or any other document, instrument or agreement evidencing, securing or otherwise relating to the loan evidenced by the Note and any and all extensions, renewals, modifications or replacements of any thereof (collectively, the "Loan Documents"); provided, however, that this Security Instrument does not and shall not in any event be deemed to, secure the obligations owing to Lender under: (a) any environmental indemnity agreement (the "Indemnity Agreement") executed in connection with such loan (or any obligations that are the substantial equivalent thereof); or (b) any guaranty of such loan.

**4.** **REPRESENTATIONS AND WARRANTIES**. Borrower represents and warrants to Lender as follows:

4.1 **Legal Status**. Borrower and all entities having a direct or indirect interest in Borrower are duly organized and existing and in good standing under the laws of the state(s) in which Borrower and such entities are organized. Borrower is qualified do to business in New Jersey, and Borrower and such entities are qualified or licensed to do business in all other jurisdictions in which such qualification or licensing is required. Borrower's legal name is exactly as shown on page 1 hereof, and Borrower's chief executive office is located at the address shown on page 1 hereof. All organizational documents of Borrower delivered to Lender are complete and accurate in every respect.

4.2 **Authorization and Validity**. The execution and delivery of the Loan Documents have been duly authorized and the Loan Documents constitute valid and binding obligations of Borrower or the party which executed the same, enforceable in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights, or by the application of rules of equity.

4.3 **Purpose**. The loan evidenced by the Note and secured by this Security Instrument (the "Loan") is primarily for commercial, industrial or business purposes and is not primarily for personal, family or household purposes.

4.4 **Violations**. The execution, delivery and performance of the Loan Documents by Borrower do not violate the provisions of any contract or instrument by which Borrower is bound.

4.5 **Subordination**. There is no contract or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations under the Note to an obligation owed to another party.

4.6 **Litigation**. There are no pending or threatened actions, claims, investigations, suits or proceedings before any governmental authority, court or administrative agency which may adversely affect: (i) the financial condition or operations of Borrower or any Guarantor; or (ii) the value, marketability or intended use of the Property, other than those previously disclosed in writing by Borrower to Lender.

4.7 **Financial Statements**. The financial statements of Borrower, each general partner of Borrower (if Borrower is a partnership), each member of Borrower (if Borrower is a limited liability company) and each Guarantor, if any, previously delivered to Lender in connection with the Loan: (i) are materially complete and correct; and (ii) disclose all liabilities that are required to be reflected or reserved against. Since the date of such financial statements, there has been no material adverse change in such financial condition, nor have any assets or properties reflected on such financial statements been sold, transferred, assigned, mortgaged, pledged or encumbered except as previously disclosed in writing to Lender and approved in writing by Lender.

4.8 **Reports**. All reports, documents, instruments and information delivered to Lender in connection with the Loan: (i) are correct and sufficiently complete to give Lender accurate knowledge of their subject matter; and (ii) do not contain any misrepresentation of a material fact or omission of a material fact which omission makes the provided information misleading.

4.9 **Leases**. (i) Borrower is the sole owner of the entire lessor's interest in the Leases; (ii) the Leases are all in full force and effect, and are the valid, binding and enforceable obligations of Borrower and the applicable tenant or lessee thereunder; (iii) no material breach or default by any tenant exists under any Lease, except as previously disclosed in the certified rent roll delivered to and approved by Lender; (iv) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified rent roll delivered to and approved by Lender; (v) none of the Rents have been assigned or otherwise pledged or hypothecated except to Lender; (vi) none of the Rents under Commercial Leases (as defined below) have been collected for more than one (1) month in advance; (vii) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (viii) there exists no offset or defense to the payment of any portion of the Rents; (ix) no Lease contains an option to purchase, right of first refusal to purchase, expansion right, or any other similar provision; (x) no person or entity has any possessory interest in, or right to occupy the Property, except under and pursuant to a Lease; and (xi) Borrower maintains all tenant security deposits in compliance with applicable law.

4.10 **Condition of Property**. Except as shown in the property condition survey or other engineering reports, if any, previously delivered to or obtained by Lender, the Property is in good condition and repair and is free from any damage that would materially and adversely affect the value, marketability or intended use of the Property.

4.11 **Hazardous Materials**. Except as previously disclosed in writing by Borrower to Lender, the Property is not and has not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of oil or other petroleum products, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials (collectively, "Hazardous Materials"). No Hazardous Materials Claims (defined below) are pending or threatened.

4.12 **Encroachments**. Except as shown in the survey, if any, previously delivered to Lender, none of the improvements on the Property lies outside of the boundaries or building restriction lines of the Property and no improvements on adjoining properties encroach upon the Property.

4.13 **Compliance With Laws**. The Property complies in all material respects with all applicable federal, state and local laws, rules and regulations.

4.14 **Permits**. Borrower holds all permits, franchises, licenses and other authorizations necessary to enable Borrower to own and operate Property in compliance with applicable law.

4.15 **Condemnation**. No proceeding for the total or partial condemnation of the Property is pending or threatened.

4.16 **Collateral**. Borrower has good title to the existing Collateral, free and clear of all liens and encumbrances except those, if any, previously disclosed to Lender by Borrower in writing specifically referring to this representation and warranty.

4.17 **Separate Tax Parcel(s)**. The Property is assessed for real estate tax purposes as one or more wholly independent tax parcels, separate from any other real property, and no other real property is assessed and taxed together with the Property or any portion thereof.

4.18 **Utilities; Water; Sewer**. The Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service. The Property is served by public water and sewer systems.

4.19 **Property Management**. If the Property is managed by a person other than Borrower then Borrower has delivered a complete and correct copy of the management agreement for the Property to Lender as in effect on the date hereof (the "Management Agreement"), and the Property is managed by the person or entity specified therein (the "Manager"). Except for the Management Agreement, if any, no management agreement has been executed and remains unterminated with respect to the Property.

4.20 **ERISA Matters**. Borrower is not an employee-benefit plan as defined in Section 3.(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which is subject to Title I of ERISA, nor a Plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to individually and collectively as "Plan"). Borrower's assets do not constitute "plan assets" of any plan within the meaning of Department of Labor Regulation Section 2510.3-101. Borrower will not transfer or convey the Property to a Plan or to a person or entity whose assets constitute such "plan assets", and Borrower will not be reconstituted as a Plan or as an entity whose assets constitute "plan assets". No Lease is with a Plan or an entity whose assets constitute such "plan assets", and Borrower will not enter into any Lease with a Plan or an entity whose assets constitute such "plan assets". With respect to the Loan, Borrower is acting on Borrower's own behalf and will not on account of or for the benefit of any Plan.

4.21 **OFAC; Anti-Corruption Laws**. Neither Borrower nor any Guarantor nor, to the knowledge of Borrower or any Guarantor, any director, officer, employee, agent, Affiliate or representative of Borrower or any Guarantor is a Prohibited Person. Borrower and Guarantors have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the U.K. Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures (which need not be written) designed to promote and achieve compliance with such laws. As used herein, "Prohibited Person" means any individual or entity that is (a) currently the subject or target of any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her

Majesty's Treasury ("HMT") other relevant sanctions authority ("Sanctions"), (b) included on the List of Specially Designated Nationals of the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the HMT Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority, or (c) any individual or entity that is owned or controlled by, acting on behalf of, or an Affiliate of, a person listed in the previous clause (a) or (b), or (d) located, organized or resident in any country or territory to the extent that such country or territory itself is the subject any Sanction. As used herein, "Affiliate, means, with respect to any subject person, any other person that directly or indirectly controls, is controlled by, or is under common control with such subject person.

5. **COVENANTS**. Borrower covenants to Lender as follows:

5.1 **Preservation of Lien**. Borrower will preserve and protect the priority of this Security Instrument as a first lien on the Property. If Borrower fails to do so, Lender may take any and all actions necessary or appropriate to do so and all sums expended by Lender in so doing shall be treated as part of the obligations secured by this Security Instrument, shall be paid by Borrower upon demand by Lender and shall bear interest at the highest rate borne by any of the obligations secured by this Security Instrument.

5.2 **Repair and Maintenance of Property**. Borrower will keep the Property in good condition and repair, which duty shall include but is not limited to cleaning, painting, landscaping, repairing, and refurbishing of the Property; will complete and not remove or demolish, alter, or make additions to any building or other improvement that is part of the Property, or construct any new structure on the Property, without the express written consent of Lender, to be given or withheld in Lender's sole and absolute discretion; will underpin and support when necessary any such building or other improvement and protect and preserve the same; will complete or restore promptly and in good and workmanlike manner any such building or other improvement that may be damaged or destroyed and pay when due all claims for labor performed and materials furnished therefor; will not commit, suffer, or permit any act upon the Property in violation of law; and will do all other acts that from the character or use of the Property may be reasonably necessary for the continued operation of the Property in a safe and legal manner, the specific enumerations herein not excluding the general.

5.3 **Insurance**.

5.3.1 **Insurance Coverage**. Borrower will provide and maintain, as further security for the faithful performance of the obligations secured by this Security Instrument, such property, liability, rental income interruption, flood and other insurance coverage as Lender may require from time to time. All such insurance must be acceptable to Lender in all respects including but not limited to the amount of coverage, policy forms, endorsements, identity of insurance companies and amount of deductibles.

5.3.2 **Acknowledgment of Insurance Requirements**. Lender's initial insurance requirements are set forth in the acknowledgment of insurance requirements dated on or about the date of this Security Instrument and entered into in connection with the Loan.

5.3.3 **Endorsement in Favor of Lender**. All policies of insurance on the Property, whether or not required by the terms of this Security Instrument (including but not limited to earthquake/earth movement insurance), shall name Lender as Lender and loss payee pursuant to a mortgage endorsement on a form acceptable to Lender.

5.3.4 **Changes in Insurance Requirements**. Lender may change its insurance requirements from time to time throughout the term of the obligations secured by this Security Instrument by giving written notice of such changes to Borrower. Without limiting the generality of the foregoing, Borrower shall from time to time obtain such additional coverages or make such increases in the amounts of existing coverage as may be required by written notice from Lender. Lender reserves the

1117492/LA                                    -7-

right, in its reasonable discretion, to increase the amount of the required coverages, require insurance against additional risks, or withdraw approval of any insurance company at any time.

5.3.5 **Control of Proceeds**. Lender shall have the right to control or direct the proceeds of all policies of insurance on the Property, whether or not required by the terms of this Security Instrument, as provided in Section 5.3.6 below, and all proceeds of all such policies are hereby assigned to Lender as security for the obligations secured by this Security Instrument. Borrower shall be responsible for all uninsured losses and deductibles.

5.3.6 **Damage and Destruction**.

(a) **Borrower's Obligations**. In the event of any damage to or loss or destruction of the Property (a "Casualty"): (i) if it could reasonably be expected to cost more than $25,000 to repair the Casualty, Borrower shall give prompt written notice of the Casualty to Lender and to Borrower's insurer, and shall make a claim under each insurance policy providing coverage therefor; (ii) Borrower shall take such actions as are necessary or appropriate to preserve and protect the Property; (iii) if the aggregate proceeds of any and all insurance policies insuring the Property, whether or not required by this Security Instrument, that are payable as a result of the Casualty (collectively, the "Insurance Proceeds") could reasonably be expected to exceed $25,000, or if a Default exists, Borrower shall take such actions as are necessary or appropriate to ensure that all Insurance Proceeds are paid to Lender forthwith to be held by Lender until applied to the obligations secured hereby or disbursed in accordance with this Section 5.3.6; and (iv) unless otherwise instructed by Lender, regardless of whether the Insurance Proceeds, if any, are sufficient for the purpose, Borrower shall promptly commence and diligently pursue to completion in a good, workmanlike and lien-free manner the restoration, replacement and rebuilding of the Property as nearly as possible to its value, condition and character immediately prior to the Casualty (collectively, the "Restoration"). If the Restoration will cost more than $25,000 to repair, Borrower shall submit the proposed plans and specifications for the Restoration, and all construction contracts, architect's contracts, other contracts in connection with the Restoration, and such other documents as Lender may reasonably request to Lender for its review and approval. Borrower shall not begin the Restoration unless and until Lender gives its written approval of such plans, specifications, contracts and other documents, with such revisions as Lender may reasonably require. Notwithstanding the foregoing, Lender shall not be responsible for the sufficiency, completeness, quality or legality of any such plans, specifications, contracts or other documents. Borrower shall pay, within ten days after demand by Lender, all costs reasonably incurred by Lender in connection with the adjustment, collection and disbursement of Insurance Proceeds pursuant to this Security Instrument or otherwise in connection with the Casualty or the Restoration.

(b) **Lender's Rights**. Lender shall have the right and power to receive and control all Insurance Proceeds required to be paid to it pursuant to Section 5.3.6(a)(iii) above. Borrower hereby authorizes and empowers Lender, in its own name or as attorney-in-fact for Borrower (which power is coupled with an interest and is irrevocable so long as this Security Interest remains of record), to make proof of loss, to settle, adjust and compromise any claim under insurance policies on the Property, to appear in and prosecute any action arising from such insurance policies, to collect and receive Insurance Proceeds, and to deduct therefrom Lender's expenses incurred in the adjustment, collection and disbursement of such Insurance Proceeds or otherwise in connection with the Casualty or the Restoration. Each insurance company concerned is hereby irrevocably authorized and directed to make payment of all Insurance Proceeds directly to Lender. Notwithstanding anything to the contrary, Lender shall not be responsible for any such insurance, the collection of any Insurance Proceeds, or the insolvency of any insurer.

(c) **Application of Proceeds**. If, at any time while Lender holds any Insurance Proceeds, an Event of Default exists or Lender determines in its reasonable discretion that the security for the obligations secured hereby is impaired, Lender shall have the option, in its sole discretion, to apply the Insurance Proceeds to the obligations secured hereby in such order as Lender may determine (or to hold such proceeds for future application to those obligations). Without limiting the generality of the foregoing, Lender's security will be deemed to be impaired if: (i) an Event of Default

exists; (ii) Borrower fails to satisfy any condition precedent to disbursement of Insurance Proceeds to pay the cost of the Restoration within a reasonable time; or (iii) Lender determines in its reasonable discretion that it could reasonably be expected that (A) Borrower will not have sufficient funds to complete the Restoration and timely pay all expenses of the Property and all payments due under the Note and the other Loan Documents through the completion of the Restoration and any leaseup period thereafter, (B) the rental income from the Property will be insufficient to timely pay all expenses of the Property and payments due under the Note and the other Loan Documents on an ongoing basis after completion of the Restoration, or (C) the Restoration cannot be completed at least six months prior to the maturity date of the Note and within one year after the date of the Casualty.

(d)    **Disbursement of Proceeds**.  If Lender is not entitled to apply the Insurance Proceeds to the obligations secured hereby, Lender (or at Lender's election, a disbursing or escrow agent selected by Lender and whose fees shall be paid by Borrower) shall disburse the Insurance Proceeds for the Restoration from time to time as the Restoration progresses, but only after satisfaction, at Borrower's expense, of such conditions precedent to such disbursements as Lender may reasonably require including but not limited to the following:  (i) Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender of the estimated cost of the Restoration; (ii) Lender shall have approved the plans, specifications and contracts for the Restoration as required by Section 5.3.6(a); (iii) Borrower shall have delivered to Lender funds in addition to the Insurance Proceeds in an amount sufficient in Lender's reasonable judgment to complete and fully pay for the Restoration; (iv) Borrower shall have delivered to Lender such building permits, other permits, architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, plats of survey and other evidence of cost, payment and performance as Lender may reasonably require and approve; and (v) if required by Lender, Borrower shall have entered into an agreement providing in greater detail for the Restoration, the disbursement of Insurance Proceeds and related matters.  No payment made prior to the final completion of the Restoration shall exceed ninety percent of the value of the work performed and materials incorporated into the Property from time to time, as such value is determined by Lender in its reasonable judgment.  Disbursements may, at Lender's election, be made on a percentage of completion basis or on such other basis as is acceptable to Lender.  Disbursements shall be subject to Borrower's delivery of such lien waivers as Lender may require, and otherwise on terms and subject to conditions acceptable to Lender.  From time to time after commencement of the Restoration, if so requested by Lender, Borrower shall deposit with Lender funds in excess of the Insurance Proceeds which, together with the Insurance Proceeds and all funds previously deposited with Lender in connection with the Restoration, must at all times be at least sufficient in the reasonable judgment of Lender to pay the entire unpaid cost of the Restoration.  Funds so deposited by Borrower may at Lender's option be disbursed prior to the disbursement of Insurance Proceeds.  Lender may retain a construction consultant to inspect the Restoration and related matters on Lender's behalf and to advise Lender with respect thereto and Borrower shall pay the cost thereof; provided that neither Borrower nor any other person or entity other than Lender shall have any right to rely on any inspection or advice of such consultant.  Such consultant shall not be the agent of Lender and shall not have the power to bind Lender in any way.  Any surplus Insurance Proceeds or other funds held by Lender pursuant to this Section 5.3.6 that may remain after payment of all costs of the Restoration shall be paid to Borrower (or to such other person or entity as Lender reasonably determines is entitled thereto) so long as no Default then exists.  No interest shall be allowed to Borrower on account of any Insurance Proceeds or other funds held by Lender pursuant to this Section 5.3.6, but at Borrower's request, Lender will deposit such amounts into a blocked interest-bearing account with Lender over which Lender has sole possession, authority and control, in which Lender has a perfected first-priority security interest to secure the obligations secured by this Security Instrument, and otherwise on terms and conditions satisfactory to Lender in its sole discretion.  Notwithstanding the above, if an Event of Default exists prior to full disbursement of the Insurance Proceeds and any other funds held by Lender pursuant to this Section 5.3.6, any undisbursed portion thereof may, at Lender's option, be applied against the obligations secured by this Security Instrument, whether or not then due, in such order and manner as Lender shall select.

(e)    **Effect on the Indebtedness**.  Any reduction in the obligations secured hereby resulting from the application of Insurance Proceeds or other funds pursuant to this Section 5.3.6 shall be deemed to take effect only on the date of such application; provided that, if any

insurance Proceeds are received after the Property is sold in connection with a judicial or nonjudicial foreclosure of this Security Instrument, or is transferred by deed in lieu of such foreclosure, notwithstanding any limitation on Borrower's liability contained herein or in the Note, the purchaser at such sale (or the grantee under such deed) shall have the right to receive and retain all such Insurance Proceeds and all unearned premiums for all insurance on the Property. No application of Insurance Proceeds or other funds to the obligations secured hereby shall result in any adjustment in the amount or due dates of installments due under the Note. No application of Insurance Proceeds to the obligations secured hereby shall, by itself, cure or waive any Default or any notice of default under this Security Instrument or invalidate any act done pursuant to such notice or result in the waiver of any collateral securing the Note.

   5.4  **Condemnation, Etc**. In the event that the Property, or any part or appurtenance thereof or right or interest therein is taken or threatened to be taken by reason of any public or private improvement or purpose, condemnation proceeding (including change of grade), or in any other manner (a "Taking"), Borrower shall give prompt written notice thereof to Lender and shall take such actions as are necessary or appropriate to preserve and protect the Property. Any and all awards of damages, whether paid as a result of judgment or prior settlement, in connection with any Taking, or for injury to any portion of the Property ("Awards"), are hereby assigned and shall be paid to Lender which may apply or disburse such Awards in the same manner, on the same terms, subject to the same conditions, to the same extent, and with the same effect as provided in <u>Section 5.3.6</u> above for disposition of Insurance Proceeds. Without limiting the generality of the foregoing, if the Taking results in a loss of the Property to an extent that Lender determines in its sole and absolute discretion renders or is likely to render the Property not economically viable, or if Lender in its sole and absolute discretion determines that its security is otherwise impaired, Lender may apply the Awards to reduce the unpaid obligations secured hereby in such order as Lender in its sole and absolute discretion may determine, and without any adjustment in the amount or due dates of installments due under the Note. If so applied, any Awards in excess of the unpaid balance of the Note and other sums due to Lender shall be paid to Borrower or Borrower's assignee. Lender shall in no case be obligated to see to the proper application of any amount paid over to Borrower. Such application or release shall not cure or waive any Default, Event of Default or notice of default hereunder or invalidate any act done pursuant to such notice. In connection with any Taking Lender may, at its option, commence, appear in and prosecute, in its own name, any action or proceeding, or make any reasonable compromise or settlement in connection with such Taking, and may obtain all Awards or other relief therefor, and Borrower agrees to pay Lender's costs and reasonable attorneys' fees incurred in connection therewith, provided, however, that Lender shall have no obligation to take any action in connection with any Taking.

   5.5  **Right of Inspection**. Borrower shall permit Lender or its agents or independent contractors (including, but not limited to, appraisers, environmental consultants and construction consultants), at all reasonable times, to enter upon and inspect the Property. Borrower agrees to pay all of Lender's costs and expenses incurred in connection with any inspection of the Property, including expenses for environmental reports and appraisals.

   5.6  **Compliance with Laws, Etc.; Preservation of Licenses**. Borrower shall comply in all material respects with (a) all laws, statutes, ordinances, rules, regulations, licenses, permits, approvals, orders, judgments and other requirements of governmental authorities relating to the Property or Borrower's use thereof, and (b) all easements, licenses and agreements relating to the Property or Borrower's use thereof. Borrower shall observe and comply with all requirements necessary to the continued existence and validity of all rights, licenses, permits, privileges, franchises and concessions relating to any existing or presently contemplated use of the Property, including but not limited to any zoning variances, special exceptions and nonconforming use permits.

   5.7  **Further Assurances**. Borrower will, at its expense, from time to time execute and deliver any and all such instruments of further assurance and other instruments and do any and all such acts, or cause the same to be done, as Lender deems necessary or advisable to grant the Property to Lender or to carry out more effectively the purposes of this Security Instrument.

5.8    **Legal Actions**.  Borrower will appear in and defend any action or proceeding before any court or administrative body purporting to affect the security hereof or the rights or powers of Lender; and will pay all costs and expenses, including cost of evidence of title, title insurance premiums and any fees of attorneys, appraisers, environmental inspectors and others, incurred by Lender, in a reasonable sum, in any such action or proceeding in which Lender may appear, in any suit brought by Lender to foreclose this Security Instrument and in any foreclosure sale under this Security Instrument.

5.9    **Taxes, Assessments and Other Liens**.  Borrower will pay prior to delinquency all taxes, assessments, encumbrances, charges, and liens with interest, on the Property or any part thereof, including but not limited to any tax on or measured by rents of the Property, the Note, this Security Instrument, or any obligation or part thereof secured hereby.

5.10    **Expenses**.  Borrower will pay all costs, fees and expenses reasonably incurred by Lender in connection with this Security Instrument.

5.11    **Repayment of Expenditures**.  Borrower will pay within five (5) days after written demand all amounts secured by this Security Instrument, other than principal of and interest on the Note, with interest from date of expenditure at the rate of interest borne by the Note and the repayment thereof shall be secured by this Security Instrument.

5.12    **Financial and Operating Information**.  Within ninety (90) days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender the following in such form as Lender may require:  (a) an itemized statement of income and expenses for Borrower's operation of the Property for that fiscal year; and (b) a rent schedule for the Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, all security deposits held (and the institution in which they are held) and any related information requested by Lender.

In addition, within twenty (20) days after written request by Lender, Borrower shall furnish to Lender such financial statements and other financial, operating and ownership information about the Property, Borrower, owners of equity interests in Borrower, and guarantors of the obligations secured hereby (each such person a "Guarantor"), as Lender may require.

If Borrower fails to provide Lender with any of the financial and operating information required to be provided under this Section within the time periods required under this Section and such failure continues after Lender has provided Borrower with thirty (30) days' notice and opportunity to cure such failure, Borrower shall pay to Lender, as liquidated damages for the extra expense in servicing the Loan, Five Hundred Dollars ($500) on the first day of the month following the expiration of such thirty (30)-day period and One Hundred Dollars ($100) on the first day of each month thereafter until such failure is cured.  All such amounts shall be secured by this Security Instrument.  Payment of such amounts shall not cure any Default or Event of Default resulting from such failure.

5.13    **Sale, Transfer, or Encumbrance of Property**.

5.13.1    **Encumbrances; Entity Changes**.  Except as otherwise provided below, Borrower shall not, without the prior written consent of Lender, to be given or withheld in Lender's sole and absolute discretion, further encumber the Property or any interest therein, or cause or permit any change in the entity, ownership, or control of Borrower without first repaying in full the Note and all other sums secured hereby.

5.13.2    **Sales, Transfers, Conveyances**.  Except as otherwise provided below, Borrower shall not, without the prior written consent of Lender, to be given or withheld in Lender's sole and absolute discretion, sell, transfer, or otherwise convey the Property or any interest therein, voluntarily or involuntarily, without first repaying in full the Note and all other sums secured hereby.

5.13.3 **Unconsented Transfers**. In each instance in which a sale, transfer or other conveyance of the Property, or any change in the entity, ownership, or control of Borrower, occurs without Lender's prior written consent thereto having been given, and regardless of whether Lender elects to accelerate the maturity date of the Note (any of the foregoing events is referred to as an "Unconsented Transfer"), Borrower and its successors shall be jointly and severally liable to Lender for the payment of a fee (the "Unconsented Transfer Fee") of two percent (2.0%) of the unpaid principal balance of the Note as of the date of such Unconsented Transfer. The Unconsented Transfer Fee shall be due and payable upon written demand therefor by Lender, and shall be secured by this Security Instrument; provided, however, that payment of the Unconsented Transfer Fee shall not cure any Event of Default resulting from the Unconsented Transfer.

5.13.4 **No Waiver**. Lender's waiver of any of the Unconsented Transfer Fee or any other amount payable hereunder, in whole or in part for any one sale, transfer or other conveyance shall not preclude the imposition thereof in connection with any other sale, transfer or other conveyance.

5.13.5 **Permitted Transfers**. Notwithstanding the foregoing and notwithstanding Section 5.14.2, Lender's consent will not be required for any Permitted Transfer (as defined below), so long as all Transfer Requirements (as defined below) applicable to such Permitted Transfer are timely satisfied. As used herein, the following terms have the meanings set forth below:

"**Permitted Transfer**" means:

(a)     The transfer of not more than twenty-five percent (25%) in the aggregate during the term of the Note of the Equity Interests (as defined below) in any Borrower (or in any entity that owns, directly or indirectly through one or more intermediate entities, an Equity Interest in any Borrower), in addition to any transfers permitted under subparagraphs (b) or (c) of this definition (a "Minority Interest Transfer");

(b)     A transfer that occurs by devise, descent or operation of law upon the death of a natural person (a "Decedent Transfer"); or

(c)     A transfer of interests in the Property, in Borrower or in any entity that owns, directly or indirectly through one or more intermediate entities, an Equity Interest in Borrower, to non-minor immediate family members (i.e., the parents, spouse, siblings, children and other lineal descendants, and the spouses of parents, siblings, children and other lineal descendants) of the transferor or to one or more trusts established for the benefit of the transferor and/or such immediate family members of the transferor (an "Estate Planning Transfer").

"**Transfer Requirements**" means, with respect to any Permitted Transfer, all of the following that apply to that transfer:

(a)     In the case of any Permitted Transfer, none of the persons or entities liable for the repayment of the Loan shall be released from such liability.

(b)     In the case of any Minority Interest Transfer or Estate Planning Transfer, there shall be no change in the individuals exercising day-to-day powers of decision-making, management and control over either Borrower or the Property unless Lender has given its prior written consent to such change in its sole discretion. In the case of a Decedent Transfer, any new individual exercising such powers must be satisfactory to Lender in its sole discretion.

(c)     In the case of a Decedent Transfer, if the decedent was a Borrower or Guarantor, within 30 days after written request by Lender, one or more other persons or entities having credit standing and financial resources equal to or better than those of the decedent, as determined by Lender in its reasonable discretion, shall assume or guarantee such loan by executing and delivering to Lender a guaranty or assumption agreement and an environmental indemnity agreement, each


satisfactory to Lender, providing Lender with recourse substantially identical to that which Lender had against the decedent and granting Lender liens on any and all interests of the transferee in the Property.

(d)     In the case of any Estate Planning Transfer that results in a transfer of an interest in the Property or in a change in the trustee of any trust owning an interest in the Property, the transferee or new trustee (in such new trustee's fiduciary capacity) shall, prior to the transfer, execute and deliver to Lender an assumption agreement satisfactory to Lender, providing Lender with recourse substantially identical to that which Lender had against the transferor or predecessor trustee and granting Lender liens on any and all interests of the transferee or the new trustee in the Property.

(e)     In the case of any Permitted Transfer that results in a transfer of an interest in the Property, Lender shall be provided, at no cost to Lender, with an endorsement to its title insurance policy insuring the lien of this Security Instrument, which endorsement shall insure that there has been no impairment of that lien or of its priority.

(f)     In the case of any Permitted Transfer, Borrower or the transferee shall pay all costs and expenses reasonably incurred by Lender in connection with that Permitted Transfer, together with any applicable fees in accordance with Lender's fee schedule in effect at the time of the Permitted Transfer, and shall provide Lender with such information and documents as Lender reasonably requests in order to make the determinations called for by this Security Instrument and to comply with applicable laws, rules and regulations.

(g)     No Default or Event of Default shall exist.

**"Equity Interest"** means the direct or indirect partnership interests in Borrower, if Borrower is a partnership, the direct or indirect member-interests in Borrower, if Borrower is a limited liability company, or the direct or indirect shares of stock of Borrower, if Borrower is a corporation, or any similar or analogous ownership interests if Borrower is any other type of entity.

5.14    **Borrower Existence**.  If Borrower is a corporation, partnership, limited liability company or other entity, Lender is making the Loan in reliance on Borrower's continued existence, ownership and control in its present form. Borrower will not alter its name, jurisdiction of organization, structure, ownership or control without the prior written consent of Lender and will do all things necessary to preserve and maintain said existence and to ensure its continuous right to carry on its business. If Borrower is a partnership, Borrower will not permit the addition, removal or withdrawal of any general partner without the prior written consent of Lender. The withdrawal or expulsion of any general partner from Borrower partnership shall not in any way affect the liability of the withdrawing or expelled general partner hereunder or on the Note.

5.15    **Information for Participants, Etc.**  Borrower agrees to furnish such information and confirmation as may be required from time to time by Lender on request of potential loan participants and assignees and agrees to make adjustments in this Security Instrument, the Note, and the Loan Documents to accommodate such participant's or assignee's requirements, provided that such requirements do not vary the economic terms of the Loan, Borrower hereby authorizes Lender to disclose to potential participants and assignees any information in Lender's possession with respect to Borrower and the Loan.

5.16    **Tax and Insurance Impounds**.

5.16.1  **Impounds**.  In addition to the payments required by the Note, Borrower agrees to pay Lender, at Lender's request, such sums as Lender may from time to time estimate will be required to pay, at least one month before delinquency, the next due taxes, assessments, insurance premiums, and similar charges affecting the Property, less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such taxes, assessments and premiums will become delinquent, such sums to be held by Lender without interest or other income to

Borrower to pay such taxes, assessments and premiums. Should this estimate as to taxes, assessments and premiums prove insufficient, Borrower upon demand agrees to pay Lender such additional sums as may be required to pay them before delinquent.

5.16.2 **Application**. If the total of the payments described in <u>Section 5.16.1</u> of this Section (collectively, the "<u>Impounds</u>") in any one year shall exceed the amounts actually paid by Lender for taxes, assessments and premiums, such excess may be credited by Lender on subsequent payments under this section. At any time after the occurrence and during the continuance of an Event of Default and at or prior to the foreclosure sale, Lender may apply any balance of funds it may hold pursuant to this Section to any amount secured by this Security Instrument and in such order as Lender may elect. If Lender does not so apply such funds at or prior to the foreclosure sale, the purchaser at such sale shall be entitled to all such funds. If Lender acquires the Property in lieu of realizing on this Security Instrument, the balance of funds it holds shall become the property of Lender. Any transfer in fee of all or a part of the Property shall automatically transfer to the grantee all or a proportionate part of Borrower's rights and interest in the fund accumulated hereunder.

5.16.3 **Tax Reporting Service**. Lender may, but need not, contract with a tax reporting service covering the Property. Borrower agrees that Lender may rely on the information furnished by such tax service and agrees to pay the cost of that service within 30 days after receipt of a billing for it.

5.16.4 **Limited Waiver**. Notwithstanding the foregoing, Lender will not require Borrower to deposit the Impounds as provided in <u>Section 5.16.1</u> of this Section so long as:  (i) the Property is owned in its entirety by the original Borrower named below (and not by any successor or transferee Borrower) and there is no change in the individuals exercising day-to-day powers of decision making, management and control over either Borrower or the Property (regardless of whether Lender has consented to any such transfer or change); (ii) Borrower pays, prior to delinquency, all payments of taxes, assessments, insurance premiums and other amounts that would otherwise be paid from the Impounds and, if required by Lender, Borrower provides Lender with proof of such payment; and (iii) no Event of Default occurs (regardless of whether it is later cured). If at any time Borrower fails to meet any of the foregoing requirements, Lender may at any time thereafter require the payment of all Impounds upon ten days written notice to Borrower.

5.17 **Leasing Matters**.

5.17.1 **Residential Lease Covenants**. Borrower shall keep and perform, in all material respects, all terms, conditions and covenants required to be performed by lessor under Leases of individual dwelling units ("<u>Residential Leases</u>"), including, without limitation, Borrower's obligations pertaining to the maintenance and disposition of security deposits. Borrower shall, in all material respects, enforce the Residential Leases and all remedies available to Borrower against the lessees thereunder in case of default under the Residential Leases by lessees. All Residential Leases shall have initial terms of not less than six (6) months and not more than twenty-four (24) months. All Residential Leases shall be on forms approved by Lender in its sole and absolute discretion. Borrower shall not enter into any Residential Lease with any Guarantor or with any person that owns or controls Borrower, any Guarantor, or any entity that directly or indirectly owns, controls, is controlled by, or is under common control with Borrower or any Guarantor.

5.17.2 **Commercial Lease Covenants; Retenanting Reserve**. Borrower shall not alter, modify, amend or change the terms of any of the Leases of portions of the Property other than individual dwelling units (such Leases, "<u>Commercial Leases</u>") or give any consent or permission or exercise any option required or permitted by the terms thereof or waive any obligation required to be performed by any lessee or execute, cancel or terminate any of the Leases or accept a surrender thereof or enter into Leases after the date hereof without the prior written consent of Lender, to be given or withheld in Lender's sole and absolute discretion. Borrower shall deliver to Lender, promptly upon receipt thereof, copies of any and all demands, claims and notices of default received by Borrower from any lessee under any of the Leases. Borrower shall keep and perform, in all material respects, all terms,

conditions and covenants required to be performed by lessor under the Leases. Borrower shall, in all material respects, enforce the Leases and all remedies available to Borrower against the lessees thereunder in case of default under the Leases by lessees. Borrower shall forthwith pay to Lender any sums received by Borrower in consideration of any full or partial termination, modification or amendment of any Lease or any release or discharge of any tenant under any Lease from any obligation thereunder and any such sums received by Borrower shall be held in trust by Borrower for such purpose. Notwithstanding the foregoing, so long as no Event of Default exists, the portion of any such sum received by Borrower with respect to any Lease that is less than five percent (5%) of the original amount of the Note shall be payable to Borrower. All such sums received by Lender with respect to any Lease shall be deemed a reserve (the "Retenanting Reserve") for the costs of retenanting the space affected by the termination, modification or amendment and shall be deposited by Lender into an account designated by, pledged to, and under the sole control of Lender. Borrower hereby grants Lender a security interest in such account and in all funds from time to time on deposit therein as collateral security for all obligations secured by this Security Instrument. If no Event of Default exists, Lender shall release the Retenanting Reserve to Borrower from time to time as necessary to pay or reimburse Borrower for such tenant improvements, brokerage commissions and other leasing costs as may be required to retenant the affected space; provided, however, Lender shall have received and approved each of the following for each tenant for which such costs were incurred: (a) Borrower's written request for such release, including the name of the tenant, the location and, net rentable area of the space and a description and cost breakdown of the tenant improvements or other leasing costs covered by the request; (b) Borrower's certification that any tenant improvements have been completed lien-free and in a workmanlike manner; (c) a fully executed Commercial Lease, or extension or renewal of the current Commercial Lease as approved by Lender (or otherwise permitted as provided below); (d) an estoppel certificate executed by the tenant including its acknowledgement that all tenant improvements have been satisfactorily completed; and (e) such other information with respect to such costs as Lender may require. Following the retenanting of all affected space (including, without limitation, the completion of all tenant improvements), and provided no Event of Default exists, Lender shall release any remaining Retenanting Reserve relating to the affected space to Borrower. Borrower shall construct all tenant improvements in a workmanlike manner and in accordance with all applicable laws, ordinances, rules and regulations. Borrower shall furnish to Lender a true and complete copy of each Commercial Lease, extension, renewal, amendment or modification of lease, hereafter made by Borrower with respect to space in the Property within thirty (30) days after delivery of each such Commercial Lease, extension, renewal, amendment or modification by the parties thereto.

5.17.3 **Tenant Estoppel Certificates**. Within 30 days after request by Lender, Borrower shall deliver to Lender and to any party designated by Lender, estoppel certificates relating to the Commercial Leases executed by Borrower and by each of the tenants party thereto, in form and substance acceptable to Lender, provided, however, if any tenant party to a Commercial Lease shall fail or refuse to so execute and deliver any such estoppel certificate upon request, Borrower shall use reasonable efforts to cause such tenant to execute and deliver such estoppel certificate but such tenant's continued failure or refusal to do so, despite Borrower's reasonable efforts, shall not constitute a Default by Borrower under this Section.

5.17.4 **Right of Subordination**. Notwithstanding anything in this Security Instrument to the contrary, Lender may, upon written notice to Borrower, elect to: (a) exclude from the assignment provided in this Security Instrument any of the Commercial Leases as specified in such notice so that the interest under such specified Commercial Lease is not assigned to Lender; (b) subordinate the lien and other terms and provisions of this Security Instrument to any of the Commercial Leases as indicated in such notice to Borrower; and (c) require Borrower to use best efforts to obtain a subordination, nondisturbance and attornment agreement, in form and substance approved by Lender, from any of the lessees under any of the Leases as indicated in such notice to Borrower.

5.17.5 **Letters of Credit**. Borrower shall notify Lender in writing prior to becoming the beneficiary under any letter of credit supporting any of the Commercial Leases, or otherwise in connection with the Property, and will take all actions, and execute all documents, necessary or appropriate to give Lender control (as defined in the Uniform Commercial Code, as enacted by any

relevant jurisdiction, including but not limited to such jurisdiction's version of Section 9407 thereof) of such letter of credit and all letter of credit rights thereunder and, if so required by Lender, to constitute Lender the transferee beneficiary of such letter of credit.

      5.17.6 **Security Deposits**.  Borrower shall maintain all security deposits collected from tenants or others with respect to the Property in accordance with all applicable legal requirements.

      5.17.7 **Leasing Uses**.  Notwithstanding anything to the contrary above, Borrower shall not enter into any Residential Leases unless such use is permitted pursuant to applicable law and the primary use of the Property is for Residential Leases or for mixed use including Residential Leases, and Borrower shall not enter into any Commercial Leases unless such use is permitted pursuant to applicable law and the primary use of the Property is for Commercial Leases or mixed uses including Commercial Leases.

      5.18  **Condominium and Cooperative Provisions**.  If the Property is not subject to a recorded condominium or cooperative regime on the date of this Security Instrument, Borrower will not subject the Property or any portion thereof to such a regime without the written consent of Lender, which consent may be granted or denied in Lender's sole discretion and, if granted, may be subject to such requirements as Lender may impose including but not limited to Borrower providing Lender with such title insurance endorsements and other documents as Lender may require.  If the Property is subject to a condominium regime on the date of this Security Instrument:  (a) Borrower represents and warrants that none of the condominium units and no portion of the common elements in the Property have been sold, conveyed or encumbered or are subject to any agreement to convey or encumber; (b) Borrower shall not in any way sell, convey or encumber or enter into a contract or agreement to sell, convey or encumber any condominium unit or any of the common elements of the Property unless expressly agreed to in writing by Lender; (c) Borrower shall operate the Property solely as a rental property; and (d) the Property granted, conveyed and assigned to Lender hereunder includes all rights, easements, rights of way, reservations and powers of Borrower, as owner, declarant or otherwise, under any applicable condominium act or statute and under any and all condominium declarations, survey maps and plans, association articles and bylaws and documents similar to any of the foregoing.

      5.19  **Use of Property; Zoning Changes**.  Unless required by applicable law or with Lender's prior written approval, to be given or withheld in Lender's sole and absolute discretion, Borrower shall not:  (a) allow any material change in the use to which the Property is being put by Borrower as an owner-occupant of the Property; or (b) initiate or acquiesce in a change in the zoning classification of the Property.

      5.20  **Publicity**.  Borrower hereby grants permission to Lender and any subsequent holder of the Loan to issue press releases, advertisements and other promotional materials concerning the financing of the Property, which materials may include the property name and description, loan amount, major tenants, loan term and amortization and the identity of Borrower and any guarantors.

      5.21  **Notice of Material Events**.  Borrower shall give Lender prompt written notice of any and all (a) litigation, arbitration or administrative proceedings that Borrower or any Guarantor is a party to or that affect the Property, and (b) other matters that have or are reasonably likely to result in a material adverse change in the condition (financial or otherwise) of Borrower, any Guarantor or the Property.  Immediately after becoming aware of the existence of any condition or event that constitutes a Default or Event of Default, Borrower shall give Lender written notice specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

      5.22  **Books and Records**.  Borrower shall maintain adequate books and records. Borrower shall permit any representative of Lender, at any reasonable time and from time to time, to inspect, audit and examine such books and records and make copies of same.

1117492/LA

5.23 **Hazardous Materials**. Borrower shall comply and cause the Property to comply with all federal, state and local laws, ordinances and regulations and all judgments, consent decrees, settlements or compromises relating to Hazardous Materials. Borrower shall immediately notify Lender in writing of any claims or actions pending or threatened against Borrower or the Property by any governmental entity or agency or any other person or entity relating to Hazardous Materials ("Hazardous Materials Claims").

5.24 **Property Management**. For so long as the Loan shall remain outstanding, the Property shall not be managed by any person other than the Manager, and Borrower shall not amend, modify, supplement or terminate the Management Agreement, enter into any other agreement providing for management of the Property, or designate any other person as property manager without Lender's prior written consent, to be given or withheld in Lender's sole and absolute discretion. Without limiting the foregoing, Lender may condition its consent to any management agreement upon the delivery of an assignment and subordination agreement with respect to such management agreement in form and substance acceptable to Lender.

6. DEFAULT; REMEDIES.

6.1 **Definition**. Any of the following shall constitute an "Event of Default" as that term is used in this Security Instrument (and the term "Default" shall mean any event that, with the passage of time or the giving of notice, would become an Event of Default):

6.1.1 any payment of principal and/or interest under the Note (including but not limited to any payment of principal or interest due on the Maturity Date, as defined in the Note) is not received by Lender on the date when due, or any other amount secured by this Security Instrument is not received by Lender within five (5) days after the date when due; or

6.1.2 any representation or warranty made by Borrower or any Guarantor to or for the benefit of Lender herein or elsewhere in connection with the Loan, including but not limited to any representation in connection with the security therefor, shall prove to have been incorrect or misleading in any material respect; or

6.1.3 Borrower, any Guarantor or any other party thereto (other than Lender) shall fail to perform its obligations under any other covenant or agreement contained in this Security Instrument, the Note, any other Loan Document or the Indemnity Agreement, which failure continues for a period of thirty (30) days after written notice of such failure by Lender to Borrower, but no such notice or cure period shall apply in the case of: (i) any such failure that could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Security Instrument, the other Loan Documents or the Indemnity Agreement, result in harm to Lender, impairment of the Note or this Security Instrument or any other security given under any other Loan Document; (ii) any such failure that is not reasonably susceptible of being cured during such 30-day period; (iii) breach of any provision that contains an express cure period; or (iv) any breach of Section 5.13 or Section 5.14 of this Security Instrument; or

6.1.4 Borrower, any Guarantor, or any other person or entity liable for the repayment of the indebtedness secured hereby shall become unable or admit in writing its inability to pay its debts as they become due, or file, or have filed against it, a voluntary or involuntary petition in bankruptcy, or make a general assignment for the benefit of creditors, or become the subject of any other receivership or insolvency proceeding, provided that if such petition or proceeding is not filed or acquiesced in by Borrower or the subject thereof, it shall constitute an Event of Default only if it is not dismissed within sixty (60) days after it is filed or if prior to that time the court enters an order substantially granting the relief sought therein; or

6.1.5 Borrower or any Guarantor shall default in the payment of any other indebtedness to Lender or an affiliate of Lender, or any other indebtedness for borrowed money in an



aggregate amount greater than $25,000, or if any such indebtedness shall be accelerated for any reason; or

       6.1.6    any Guarantor dies, becomes incapacitated, or attempts to revoke its guaranty; or

       6.1.7    this Security Instrument, the Note or any other Loan Document shall fail to remain in full force or effect, or any action shall be taken by Borrower, any Guarantor, or any other person to revoke, discontinue or assert the invalidity or unenforceability thereof; or

       6.1.8    any judgment for the payment of money is entered against Borrower or any Guarantor and not be satisfied or stayed pending appeal within thirty (30) days thereafter; or

       6.1.9    an attachment or garnishment writ or the like is issued or levied against all or any material portion of the Property and is not released, vacated or fully bonded within 30 calendar days after its issue or levy; or

       6.1.10  A tax, charge or lien shall be placed upon or measured by the Note, this Security Instrument, or any obligation secured hereby that Borrower does not or may not legally pay in addition to the payment of all principal and interest as provided in the Note.

       If an Event of Default exists, then such Event of Default will continue to exist until it either is cured (to the extent specifically permitted) in accordance with the Loan Documents, and Lender acknowledges such cure, or is otherwise expressly waived in writing by Lender.

       6.2    **Lender's Right to Perform**. After the occurrence and during the continuance of any Event of Default, Lender, but without the obligation so to do and without notice to or demand upon Borrower and without releasing Borrower from any obligations hereunder, may: make any payments or do any acts required of Borrower hereunder in such manner and to such extent as either may deem necessary to protect the security hereof, Lender being authorized to enter upon the Property for such purposes; commence, appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Lender; pay, purchase, contest or compromise any encumbrance, charge or lien in accordance with the following paragraph; and in exercising any such powers, pay necessary expenses, employ counsel and pay a reasonable fee therefor. All sums so expended shall be payable on demand by Borrower, be secured hereby and bear interest at the Default Rate of interest specified in the Note from the date advanced or expended until repaid.

Lender, in making any payment herein, is hereby authorized, in the place and stead of Borrower, in the case of a payment of taxes, assessments, water rates, sewer rentals and other governmental or municipal charges, fines, impositions or liens asserted against the Property, to make such payment in reliance on any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of the bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof; in the case of any apparent or threatened adverse claim of title, lien, statement of lien, encumbrance, deed of trust, mortgage, claim or charge Lender, as the case may be, shall be the sole judge of the legality or validity of same; and in the case of a payment for any other purpose herein and hereby authorized, but not enumerated in this paragraph, such payment may be made whenever, in the sole judgment and discretion of Lender, as the case may be, such advance or advances shall seem necessary or desirable to protect the full security intended to be created by this Security Instrument, provided further, that in connection with any such advance, Lender at its option may and is hereby authorized to obtain a continuation report of title prepared by a title insurance company, the cost and expenses of which shall be repayable by Borrower without demand and shall be secured hereby.

       6.3    **Remedies on Default**. Automatically upon the occurrence of any Event of Default under <u>Section 6.1.4</u> above with respect to Borrower, and at the option of Lender in Lender's sole

and absolute discretion upon the occurrence of any other Event of Default, all sums secured hereby shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which Borrower hereby expressly waives, and Lender may:

6.3.1 Have a receiver appointed as a matter of right on an *ex parte* basis without notice to Borrower and without regard to the sufficiency of the Property or any other security for the indebtedness secured hereby and, without the necessity of posting any bond or other security. Such receiver shall take possession and control of the Property and shall collect and receive the Rents. If Lender elects to seek the appointment of a receiver for the Property, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. The receiver shall be entitled to receive a reasonable fee for managing the Property, which fee may be deducted from the Rents or may be paid by Lender and added to the indebtedness secured by this Security Instrument. Immediately upon appointment of a receiver, Borrower shall surrender possession of the Property to the receiver and shall deliver to the receiver all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Property and all security deposits. If the Rents are not sufficient to pay the costs of taking control of and managing the Property and collecting the Rents, any funds expended by Lender, or advanced by Lender to the receiver, for such purposes shall become an additional part of the indebtedness secured by this Security Instrument. The receiver may exclude Borrower and its representatives from the Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 6.3 shall not be construed to make Lender a Lender-in-possession of the Property so long as Lender has not itself entered into actual possession of the Property.

6.3.2 Foreclose this Security Instrument pursuant to a judicial foreclosure proceeding or otherwise realize upon the Property.

6.3.3 Exercise its power of sale.

6.3.4 Sue on the Note as permitted under applicable law.

6.3.5 Avail itself of any other right or remedy available to it under the terms of this Security Instrument, the other Loan Documents or applicable law.

6.4 **Deemed Prepayment**. If at any time after an Event of Default and acceleration of the indebtedness secured hereby there shall be a tender of payment of the amount necessary to satisfy such indebtedness by or on behalf of Borrower, its successors or assigns, the same shall be deemed to be a voluntary prepayment such that the sum required to satisfy such indebtedness in full shall include, to the extent permitted by law, the additional payment required under the prepayment terms of the Note.

6.5 **No Waiver**. By accepting payment of any sum secured hereby after its due date, Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare an Event of Default for failure to do so.

6.6 **Waiver of Marshaling, Etc.** In connection with any foreclosure sale under this Security Instrument, Borrower hereby waives, for itself and all others claiming by, through or under Borrower, any right Borrower or such others would otherwise have to require marshaling or to require that the Property be sold in parcels or in any particular order.

6.7 **Remedies Cumulative; Subrogation**. The rights and remedies accorded by this Security Instrument shall be in addition to, and not in substitution of, any rights or remedies available under now existing or hereafter arising applicable law. All rights and remedies provided for in this Security Instrument or afforded by law or equity are distinct and cumulative and may be exercised concurrently, independently or successively. The failure on the part of Lender to promptly enforce any

right hereunder shall not operate as a waiver of such right and the waiver of any Default or Event of Default shall not constitute a waiver of any subsequent or other Default or Event of Default. Lender shall be subrogated to the claims and liens of those whose claims or liens are discharged or paid with the proceeds of the Loan or the Property.

7. Intentionally omitted.

8. **INDEMNITY.** Borrower shall defend, indemnify and hold harmless Lender (including, without limitation, any purchaser or assignee of or participant in the Loan), any entity controlling, controlled by, or under common control with Lender, the directors, officers, employees and agents of Lender and such other entities, and the heirs, successors and assigns of each of the foregoing persons (each an "Indemnified Party" and together the "Indemnified Parties") from and against any claim, loss, damage, cost, expense or liability directly or indirectly arising out of: (a) any failure of Borrower to perform Borrower's obligations under the Loan Documents; (b) any inaccuracy in any representation or warranty of Borrower under the Loan Documents; (c) any alleged obligation on the part of any Indemnified Party to pay or perform any obligations contained in any other document related to the Property (other than this Security Instrument); or (d) any act or omission by Borrower or any contractor, agent, employee or invitee of Borrower with respect to the Property. The foregoing to the contrary notwithstanding, this indemnity shall not include any claim, loss, damage, cost, expense or liability directly or indirectly arising out of the gross negligence or willful misconduct of any Indemnified Party. Borrower shall pay immediately upon Lender's demand any amounts owing under this indemnity together with interest from the date the indebtedness arises until paid at the rate of interest applicable to the principal balance of the Note as specified therein. Borrower agrees to use legal counsel reasonably acceptable to the applicable indemnified Parties in any action or proceeding arising under this indemnity. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION AND/OR RECONVEYANCE OR RELEASE AND/OR DISCHARGE OF THIS SECURITY INSTRUMENT.

9. **FIXTURE FILING.** This Security Instrument constitutes a financing statement, filed as a fixture filing in the real estate records of the county of the state in which the real property described in Exhibit A is located, with respect to any and all fixtures included within the list of improvements and fixtures described in Section 1.2 of this Security Instrument and to any goods or other personal property that are now or hereafter will become a part of the Property as fixtures.

10. **MISCELLANEOUS.**

10.1 **Notices.** Any notice to or demand upon Borrower (including any notice of default or notice of sale) or Lender shall be deemed to have been sufficiently made for all purposes when deposited in the United States mails, postage prepaid, registered or certified, return receipt requested, addressed to Borrower or Lender, as applicable, at its respective address set forth in the first paragraph after the title of this Security Instrument, or to such other address as the recipient may have directed by notice in accordance herewith. The giving of notice may be waived in writing by the person or persons entitled to receive such notice, either before or after the time established for the giving of such notice.

10.2 **Modifications, Etc.** Each person or entity now or hereafter owning any interest in the Property agrees, by executing this Security Instrument or taking the Property subject to it, that Lender may in its sole discretion and without notice to or consent of any such person or entity: (a) extend the time for payment of the obligations secured hereby; (b) discharge or release any one or more parties from their liability for such obligations in whole or in part; (c) delay any action to collect on such obligations or to realize on any collateral therefor; (d) release or fail to perfect any security for such obligations; (e) consent to one or more transfers of the Property, in whole or in part, on any terms; (f) waive or release any of holder's rights under any of the Loan Documents; (g) agree to an increase in the amount of such obligations or to any other modification of such obligations or of the Loan Documents; or (h) proceed against such person or entity before, at the same time as, or after it proceeds against any other person or entity liable for such obligations.

1117492/LA                                                          -20-

10.3 **Successors and Assigns**. All provisions herein contained shall be binding upon and inure to the benefit of the respective successors and assigns of the parties.

10.4 **Governing Law; Severability**. This Security Instrument shall be governed by the law of the State of New Jersey, without regard to its conflicts of law provisions. In the event that any provision or clause of this Security Instrument, the Note or any other Loan Document conflicts with applicable law, the conflict shall not affect other provisions of this Security Instrument, the Note or such other Loan Document that can be given effect without the conflicting provision and to this end the provisions of this Security Instrument, the Note and the other Loan Documents are declared to be severable.

10.5 **Attorneys' Fees and Legal Expenses**. In the event of any Default under this Security Instrument, or in the event that any dispute arises relating to the interpretation, enforcement or performance of any obligation secured by this Security Instrument, Lender shall be entitled to collect from Borrower on demand all fees and expenses incurred in connection therewith, including but not limited to fees of attorneys, accountants, appraisers, environmental inspectors, consultants, expert witnesses, arbitrators, mediators and court reporters. Without limiting the generality of the foregoing, Borrower shall pay all such costs and expenses incurred in connection with: (a) arbitration or other alternative dispute resolution proceedings, trial court actions and appeals; (b) bankruptcy or other insolvency proceedings of Borrower, any guarantor or other party liable for any of the obligations secured by this Security Instrument or any party having any interest in any security for any of those obligations; (c) judicial or nonjudicial foreclosure on, or appointment of a receiver for, any of the Property; (d) post-judgment collection proceedings; (e) all claims, counterclaims, cross-claims and defenses asserted in any of the foregoing whether or not they arise out of or are related to this Security Instrument; (f) all preparation for any of the foregoing; and (g) all settlement negotiations with respect to any of the foregoing.

10.6 **Time Is of the Essence**. Time is of the essence under this Security Instrument and in the performance of every term, covenant and obligation contained herein.

10.7 **Interpretation; Headings; Final Agreement**. Whenever the context so requires the singular number includes the plural herein, and the impersonal includes the personal. The headings to the various sections have been inserted for convenient reference only and shall not modify, define, limit or expand the express provisions of this Security Instrument. This Security Instrument, the Note and the other Loan Documents constitute the final expression of the entire agreement of the parties with respect to the transactions set forth therein. No party is relying upon any oral agreement or other understanding not expressly set forth in the Loan Documents. The Loan Documents may not be amended or modified except by means of a written document executed by the party sought to be charged with such amendment or modification.

10.8 **No Third Party Beneficiaries**. No creditor of any party to this Security Instrument and no other person or entity shall be a third party beneficiary of this Security Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (a) any arrangement (a "Servicing Arrangement") between Lender and any servicer of the Loan for loss sharing or interim advancement of funds shall constitute a contractual obligation of such servicer that is independent of the obligation of Borrower for the payment of the indebtedness secured hereby, (b) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (c) no payment by a servicer under any Servicing Arrangement will reduce the amount of the indebtedness secured hereby.

10.9 **Submission to Jurisdiction**. Borrower irrevocably submits to the nonexclusive jurisdiction of any federal or state court sitting in Hudson County, New Jersey, over any suit, action or proceeding arising out of or relating to this Security Instrument, the Note, any other Loan Document or the Property. Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt

requested, to Borrower's address shown on the first page of this Security Instrument or as notified to Lender and (ii) by serving the same upon Borrower(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

10.10 **WAIVER OF JURY TRIAL.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (FOR ITSELF AND ITS SUCCESSORS, ASSIGNS AND PARTICIPANTS) WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS SECURITY INSTRUMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS PROVIDED FOR HEREIN OR THEREIN, IN ANY LEGAL ACTION OR PROCEEDING OF ANY TYPE BROUGHT BY ANY PARTY TO ANY OF THE FOREGOING AGAINST ANY OTHER SUCH PARTY, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT SITTING WITHOUT A JURY.

10.11 **Release.** Upon indefeasible repayment in full of all sums owing and outstanding under the Loan Documents and full satisfaction of all other obligations under the Loan Documents, Lender shall terminate and release the lien of this Security Instrument, without warranty.

10.12 **Waiver of Right of Offset.** No portion of the indebtedness secured by this Security Instrument shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Lender.

11. NEW JERSEY STATE PROVISIONS.

11.1 **Principles of Construction.** In the event of any inconsistencies between the terms and conditions of this Section 11 and the other terms and conditions of this Security Instrument, the terms and conditions of this Section 11 shall control and be binding.

11.2 **Non-Residential Property.** This Security Instrument does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate six (6) residential dwelling units or less, each unit having its own separate cooking facilities, nor by a one to six family residence occupied by the owner, nor consisting of any property owned by a cooperative apartment corporation.

11.3 **Certain Waivers.** Borrower hereby waives and releases all benefit that might accrue to Borrower by virtue of any present or future law exempting the Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any stay of execution, exemption from civil process or extension of time for payment, or any right of marshalling in the event of any sale hereunder of the Property, and, unless specifically required herein, all notices of Borrower's default or of Lender's election to exercise, or Lender's actual exercise of any option under this Security Instrument or any other Loan Documents. Borrower waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Borrower, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action or any other action to exercise its remedies hereunder or otherwise available at a law or in equity.

11.4 **Maximum Secured Amount.** The maximum amount of the obligations secured hereby is as follows: (a) the principal amount of up to **Six Hundred Seventy-Five Thousand and 00/100** Dollars (**$675,000.00**), plus (b) interest, fees, costs and expenses (including attorneys' fees and expenses), other charges and fees for which Borrower is obligated to Lender pursuant to this Security Instrument, the Note or otherwise, plus (c) any advances made by Lender to protect or preserve the Property, any part thereof or the interests of Lender therein (including, but not limited to, (i) the reasonable expenses of any litigation to prosecute or defend the rights and lien created by this Security Instrument and (ii) any amount, cost or charges to, which the Security Instrument becomes subrogated,

upon payment, whether under recognized principles of law or equity, or under express statutory authority) or any advances made for payment of taxes, charges or assessments in connection with any or all of the Property, or premiums on insurance with respect to any or all of the Property. The foregoing limitation on the obligations secured hereby shall not, in any manner, limit the amount of any obligations, liabilities or indebtedness secured by any of the other Loan Documents or other collateral granted thereunder, nor affect the priority thereof.

1.1.5 **Enforceability; Usury.** In no event shall any provision of this Security Instrument or any other Loan Document ever obligate Borrower to pay or allow Lender to collect interest on the obligations or any other indebtedness secured hereby at a rate greater than the maximum non-usurious rate permitted by applicable law (herein referred to as the **"Highest Lawful Rate"**), or obligate Borrower to pay any taxes, assessments, charges, insurance premiums or other amounts to the extent that such payments, when added to the interest on the obligations or any other indebtedness secured hereby, would be held to constitute the payment by Borrower of interest at a rate greater than the Highest Lawful Rate; and this provision shall control over any provision to the contrary. Notwithstanding the foregoing, in the event Borrower shall pay or Lender shall receive any interest at a rate greater than the Highest Lawful Rate (the **"Excess Amount"**) the entire Excess Amount automatically shall be deemed to be a payment on account of, and shall be credited against and reduce, the principal amount of the obligations secured hereby.

11.6 **Future Advances.** This Security Instrument is given for the purpose of creating a lien on real property in order to secure not only existing indebtedness, but also future advances, whether such advances are obligatory or to be made at the option of Lender, or otherwise, and whether made before or after default or maturity or other similar events, to the same extent as if such future advances were made on the date of the execution hereof, although there may be no advance made at the time of the execution hereof and although there may be no indebtedness outstanding at the time any advance is made. The types of future advances secured by and having priority under this Security Instrument shall include, without limitation, (i) advances and readvances of principal under the Note or other Loan Documents and (ii) disbursements and other advances for the payment of taxes, assessments, maintenance charges, insurance premiums or costs relating to the Property, for the discharge of liens having priority over the lien of this Security Instrument, for the curing of waste of the Property and for the payment of service charges and expenses incurred by reason of default and including late charges, attorney's fees and court costs, together with interest thereon. The lien of this Security Instrument, as to third persons with or without actual knowledge thereof, shall be valid as to all such indebtedness and future advances, from the date of recordation, to the extent permitted by the laws of the state in which the Property is situated. The total amount of the indebtedness secured by this Security Instrument may decrease or increase from time to time, but the total unpaid principal balance at any one time shall not exceed the maximum principal amount of the Obligations.

11.7 **Loan Subject to Modification.** This Security Instrument secures a loan which by its terms is subject to modification as defined under P.L. 1986 c. 353 (N.J.S.A. 46:9-8.1. et seq.) and shall be subject to the priority provisions thereof and the priority of the lien of this Security Instrument with respect to any and all modification (as so defined) shall relate back to and remain as it was at the time of recording of this Security Instrument (with the same effect as if such modifications were originally included in this Security Instrument or as if the modification occurred at the time of the recording of this Security Instrument). This shall include, but not be limited to, subsequent advances of principal pursuant to the Loan Documents.

11.8 **True and Complete Copy.** BORROWER ACKNOWLEDGES THAT BORROWER HAS RECEIVED, WITHOUT CHARGE, A TRUE AND CORRECT COPY OF THIS SECURITY INSTRUMENT.

11.9 **Continuing Enforcement of Mortgage.** If, after receipt of any payment of all or any part of the Loan, Lender is compelled under the Loan Documents or pursuant to a judgment to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance or a

diversion of trust funds), then this Security Instrument and the other Loan Documents shall continue in full force and effect, and Borrower shall be liable for, and shall indemnify, defend and hold harmless Lender with respect to the full amount so surrendered. The provisions of this Section 11.9 shall survive the cancellation or discharge of this Security Instrument and shall remain effective notwithstanding the payment of the Loan, the cancellation of the Note, the release of any security interest, lien or encumbrance securing the Loan or any other action which Lender may have taken in reliance upon its receipt of such payment. Any cancellation, release or other such action by Lender shall be deemed to have been conditioned upon any payment of the Loan having become final and irrevocable.

      11.10  **No Merger**.  There shall be no merger of the interest or estate created by this Security Instrument with any other interest or estate in the Property at any time held by or for the benefit of Lender or any subsidiary or affiliate in any capacity, without the express prior written consent of Lender and the rights of Lender set forth herein and in the Loan Documents shall, to the extent not prohibited by law, extend also to the period from and after the filing of any suit to foreclose the lien of this Security Instrument, the entry of judgment and any subsequent period including any period allowed by law for the redemption of the Property after any foreclosure sale.

      11.11  **Waiver of Jury Trial**.  Section 10.10 is hereby amended by adding the following paragraph at the end of that section:  IN ADDITION, BORROWER (OR ANY ONE OF THEM, IF MORE THAN ONE) HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS SECURITY INSTRUMENT, THE DEBT, THE OBLIGATIONS, THE LOAN AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY BORROWER OR LENDER OR WHICH IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN BORROWER AND LENDER.  THIS WAIVER OF A RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

      11.12  **ISRA Filings in New Jersey**.  In the event that Lender seeks to take possession of the Property in New Jersey or in any other instance in which compliance is required, Borrower, at its sole cost and expense, shall address the potential requirements of the Industrial Site Recovery Act, N.J.S.A. §13:1K-6 et seq., as amended ("ISRA") and all related regulations promulgated by the New Jersey Department of Environmental Protection ("NJDEP").  In the event ISRA compliance is triggered by any action of Borrower including, but not limited to Borrower's surrendering possession of the Property to Lender, Borrower shall be responsible, at its sole cost and expense, for complying with the terms and requirements of ISRA. Lender, however, shall cooperate with Borrower in its ISRA compliance activities, including but not limited to (i) providing Borrower and its agents with access to the Real Property where reasonably necessary to satisfy ISRA or NJDEP requirements, including, by way of example and not limitation, access for the purposes of inspecting the Real Property or for obtaining soil, water, groundwater or other samples, (ii) providing documents within its sole possession, and (iii) executing documents needed for submission to the NJDEP or others.

      11.13  **Site Remediation Reform Act**.  Notwithstanding anything to the contrary contained herein, Borrower shall comply with the requirements of the Site Remediation Reform Act (S.1897/A.2962) ("SRRA") and in the event ISRA compliance is required, Borrower shall, at its sole cost and expense, retain the services of a Licensed Site Remediation Profession (as defined in the SRRA) ("LSRP") and shall perform all actions necessary or useful to cause the LSRP to issue an unconditional Response Action Outcome (as defined in the SRRA).

      11.14  **Interest Rate Not Reduced on Judgment**.  In the event Lender obtains any judgment against Borrower on this Security Instrument, the Note, the Loan Agreement or on the other Loan Documents, whether such judgment is obtained by confession or otherwise, interest shall accrue on the judgment in the same manner and at the same rate as provided in the Note, notwithstanding any law,

custom or legal presumption to the contrary, subject only to the usury savings clauses of the Note and this Security Instrument, until Lender has received payment in full of all amounts due pursuant to this Security Instrument, the Note, and the other Loan Documents secured hereby.

11.15 **No Construction against Drafting Party**. Borrower and Lender have been represented by independent counsel of their own selection in connection with the negotiation, execution and delivery of this Security Instrument and the other documents, instruments, records and papers relating hereto, and, without waiving the attorney-client privilege and expressly preserving the same, Borrower and Lender acknowledge that they have made such comments on this Security Instrument and the other documents, instruments, records and papers relating hereto as they have deemed necessary under the circumstances. Borrower and Lender intend that this Security Instrument and the other documents, instruments, records and papers relating hereto, shall not be construed against one party or the other based upon any rule of any applicable law giving preference in interpretation to the drafting or non-drafting party or its counsel.

*[Remainder of this page intentionally left blank]*



DATED as of the day and year first above written.

BORROWER:

NORTH BERGEN VENTURES LLC,
a New Jersey limited liability company

By: _____

Name: Seth Levine

Title: Sole Member

Signature Page to Mortgage

1117492/LA

**ACKNOWLEDGMENT**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

ACKNOWLEDGMENT

STATE OF NEW JERSEY )
: SS.:
COUNTY OF _____ Bllau _____ )

On the 7th day of _____ September _____, before me personally came Seth Levine, to me known to be the person who executed the foregoing instrument, and who, being by me duly sworn, did depose and say that he/she is the Sole Member of North Bergen Ventures LLC, a New Jersey limited liability company and that he/she executed the foregoing instrument in the name of said company, and that he/she had authority to sign the same, and acknowledge that he/she executed the same as the act and deed of said company.

_____
(Notary)

ANDREW SELEVAN
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 1/25/2021

Acknowledgment to Mortgage

1117492/LA

## EXHIBIT "A"

### LEGAL DESCRIPTION

The property consists of the land and all the building and structures on the land in the Township of North Bergen, County of Hudson and State of New Jersey.

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Township of North Bergen, County of Hudson, State of New Jersey.

BEING known and designated as Lot 44 in Block F-6, as shown on a certain map entitled "Map of Lots in Share DeMott Homestead Farm", filed in the Hudson County Register's Office on March 16, 1869 as Map No. 225

BEGINNING at a point in the Northerly line of Seventh Street, formerly known as DeMott Street, where the same is intersected by the division line between Lots 43 and 44 in Block F-6, 138.10 feet as measured, 88.10 feet by deed, Westerly from the corner formed by the intersection of the Northerly line of Seventh Street with the new Westerly line of J.F. Kennedy Boulevard, formerly known as Hudson Boulevard and Bergenwood Avenue, and from thence running:

1. North 58 degrees 42 minutes West, and along the aforementioned Northerly line of Seventh Street, 25.00 feet to a point in the division line of Lots 44 and 45 on the said filed map; thence

2. North 31 degrees 24 minutes Eat, and along division line of Lots 44 and 45, 100.00 feet to a point in the division Lots 44 and 99; thence

3. South 58 degrees 42 minutes East, and along said division line of Lots 44 and 99, 25.00 feet to a point in the division line of Lots 43 and 44; thence

4. South 31 degrees 24 minutes West, and along said division line of Lots 43 and 44, 100.00 feet to the Northerly line of Seventh Street, and the point or place of BEGINNING.



EXHIBIT "A"

-1-

1117492/LA